*In re* BENJAMIN HILLYER *et al.*, Minors.—(THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, *v.* MARJORIE HILLYER, Respondent-Appellant.)

Third District   No. 78-470

Opinion filed March 26, 1980.—Rehearing denied April 25, 1980.

STOUDER, P. J., specially concurring.

Stanley L. Tucker, of Hartzell, Glidden, Tucker & Neff, of Carthage, for appellant.

Patrick Corcoran, State's Attorney, of Carthage (John X. Breslin and Gary F. Gnidovec, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE STENGEL delivered the opinion of the court:

Marjorie Hillyer, mother of Benjamin, Jerry, and Clarence Hillyer, appeals from an order of the Circuit Court of Hancock County terminating her parental rights and placing custody, guardianship, and the power to consent to adoption in the Department of Children and Family Services of the State of Illinois.

In 1970, at the behest of the Department, Hazel, Benjamin, Jerry, and Clarence Hillyer, all minors, were adjudged neglected and removed from the custody of their parents, Wayne and Marjorie Hillyer. In 1971, the Department filed a petition seeking to have parental rights terminated. The father, who was then 75 years of age, executed proper consents for the adoption of the children, but after an evidentiary hearing, the trial court denied the petition to terminate the mother's parental rights. During those proceedings and thereafter, the mother was represented by a court-appointed attorney.

In June of 1972, after a hearing upon the mother's petition for a return of custody, the court ordered Hazel and Benjamin returned to their mother. In March of 1973, a further order was entered giving physical custody of Clarence to his mother and directing a later transfer of physical custody of Jerry at such time as the guardian feels she can take proper care of Jerry. Apparently Jerry was never returned to his mother. In September 1975, the Department filed a supplemental petition requesting termination of the mother's parental rights to Benjamin, Jerry, and Clarence. Numerous motions, pleadings, and proceedings not relevant to this appeal followed.

In June of 1977, the record indicates that a specially retained attorney entered an appearance as co-counsel for the Department and thereafter an amended supplemental petition was filed. The mother filed a motion to strike the petition, and as one of several grounds, she asserted that the case was being improperly prosecuted by privately employed counsel instead of by the State's Attorney. The motion to strike was denied, and on January 17, 1978, the Department filed a second amended supplemental petition which alleged the mother's failure to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of her three minor sons. A trial was held in April 1978, after which the trial court found the mother unfit as alleged. The court order terminated her

parental rights, placed the children in the custody and guardianship of the Department, and empowered the guardian to consent to the adoption of the three boys.

The mother's attorney petitioned the trial court to fix attorney's fees in the amount of $2,571.15 based upon an hourly rate of $40 per hour and also to pay expenses of $55, for a total of $2,626.15. A hearing was held upon the petition, at which the mother's counsel presented evidence in support of his claim for fees. The court fixed the attorney's fees plus expenses at $1,626.20. The court used as a basis the usual and customary fees for attorneys representing indigents in juvenile proceedings in the Ninth Judicial Circuit, which are $20 per hour for the time spent in preparation out of court and $30 for time spent in court.

The mother has appealed from the orders of the circuit court, and she assigns as error (1) that the finding of unfitness was contrary to the manifest weight of the evidence; (2) that the Department's representation by special counsel was improper; and (3) that the award of attorney's fees was arbitrary. We affirm on all issues.

A summary of the evidence is necessary for an understanding of the mother's arguments. At trial, the Department social worker, Robert Trine, testified that he was assigned to the Hillyer family in 1972 after two of the children had been returned to the custody of their mother. In May of 1973, the mother separated from her husband, and in June she moved to the Indian Hills Housing Project in Quincy where she lived with Benjamin, Clarence, and her daughter Hazel. (Son Jerry remained in foster care.) She received aid for dependent children, was visited two or three times each month by Trine, and three times each week by a homemaker to help her improve her housekeeping skills. Both Trine and the homemaker, who is no longer employed by the Department, testified at length to the filthy conditions of the mother's apartment and her refusal to do anything about the unhealthy, unsanitary situation. She did not wash dishes or pans, did not do laundry, did not remove garbage and trash, did not bathe or shampoo or cut the hair of the children, and did not get up in the morning to get the children off to school. Trine stated that upon occasion he told the mother that he would have to remove the children from her custody if she did not keep them clean and improve her housekeeping. Both witnesses testified to the presence of flies and roaches and to the dirtiness of the children. Both described in detail the deplorable condition of the home, and the mother's refusal to make any effort to improve. After the children started a fire in a closet one morning while the mother was asleep, the family was evicted from the housing project, and a short time later, on April 7, 1974, the Department moved the children from the mother's custody.

Trine testified that he visited the mother three times after the children

were taken from her in 1974, and that each time he told her that she had a right to visit the children and that he would arrange a visit. He talked to her about making plans for suitable housing and for getting the children back, but she said she was going to make her life with her boyfriend. Thereafter she moved several times, spending some time in Tennessee and St. Louis before returning to the area in March of 1977.

In September of 1975, Trine decided to seek termination of the mother's parental rights since the mother had not contacted him and had no plans for the return of the children. Generally, after a petition to terminate parental rights has been filed, it is Department policy not to arrange or encourage visits. Social Worker Lou White was assigned to the Hillyer case in August of 1976, and in March of 1977 she visited the mother solely for the purpose of meeting her. Mrs. White testified that the mother did not inquire about the children then or two months later when they met accidentally. The mother's only contact with the children consisted of two visits in December of 1977, and another one week before the trial.

The foster father of the children testified that in December of 1977, the Department gave the mother permission to visit once every two weeks, that he invited her to come to their home for her visits, that she never came again, and that at the time of the December 1977 visits, one boy recognized her but the other two did not.

At the time of trial Ben was 12½ years old, Jerry was 11½ years, and Clarence was 10 years old. The mother requested that the boys be called as witnesses. At an informal proceeding in chambers, the trial court determined that Jerry was not competent to testify but that Clarence and Benjamin were. Clarence could not remember living with his mother. Benjamin remembered living in the apartment in Quincy and recalled attending a special school there.

The mother testified in minute detail as to her methods of washing dishes, doing laundry, and giving the children baths. She said she wore herself out with all this work plus playing with the children so that she could not clean up the dishes or uneaten food at night, but had to leave them until morning. She admitted that she often slept late. At the time of trial she was 41 years old, and supported herself by babysitting for her sister with whom she stayed. Before that, she resided with her mother. She cannot read, can write only her name, can add but not subtract, multiply or divide, and she can use the telephone but cannot find a number in the telephone book. She also stated that after the children were taken from her, Trine told her not to try to see them again because she would never get them back. As a result she made no effort to see the children and did not ask anyone for advice. The court took judicial notice that the mother has had court-appointed counsel since 1971. She also

testified that she walked to Memphis, Tennessee, and that she was disabled with knee surgery after she returned.

On rebuttal, Trine emphatically denied ever telling the mother that she could not visit her children and stated that, to the contrary, when the children were first placed in foster care, he told her it was important to the children for her to see them. He also contradicted the mother's account of her housekeeping methods at the Indian Hills apartment.

On direct, Trine testified to two brief contacts initiated by the mother after the children were removed from her custody. In August of 1974, her boyfriend called Trine to say that the mother wanted to see the children, but when she came on the line, she refused to make any arrangements for a visit. In July or August of 1976, the mother came up to Trine on the courthouse lawn in Carthage and said she wanted to see her children. Trine advised her to see her lawyer first and then to come to his office, but she did not contact him again. According to Trine, when the children were placed in foster care, the mother lived in an apartment three blocks from the Department office, that she had been there, and that she knew the Department could provide transportation for a visit since she had utilized Department transportation in the past. However, the mother testified that she did not remember where the Department was located and that she lacked transportation.

We begin with the general rule that the rights of natural parents to their children will be terminated only upon proof of parental unfitness by clear and convincing evidence, and a reviewing court will not reverse the trial court's determination unless it is palpably erroneous and contrary to the manifest weight of the evidence. (*In re Jones* (1975), 34 Ill. App. 3d 603, 340 N.E.2d 269.) Section 5—9 of the Juvenile Court Act (Ill. Rev. Stat. 1977, ch. 37, par. 705—9) provides that a finding of unfitness of a parent who does not consent to adoption must be made in compliance with the Adoption Act (Ill. Rev. Stat. 1977, ch. 40, par. 1501 *et seq.*). One of the grounds for parental unfitness set out in section 1 of the Adoption Act is as follows:

> "(b) Failure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare." Ill. Rev. Stat. 1977, ch. 40, par. 1501(D)(b).

The petition in the case at bar was framed in the statutory language just quoted, and also alleged that, after April 1974, the mother failed to contact the Department for purpose of visitation; that before April 1974, she failed to supervise the children properly with regard to school attendance; and that while the children were with her from March 1973 to April 1974, she failed to maintain a clean and healthy household for the children.

The mother argues upon appeal that the trial court failed to give

sufficient weight to the evidence that Trine threatened her with removal of the children before April of 1974, that she tried to arrange visits in August 1974 and July 1976, and that the Department applied its policy of no visitation when termination is sought. The question, of course, is whether the ruling of the court was contrary to the manifest weight of the evidence.

■■ When all of the evidence is considered, not just that favorable to the mother, we think it clear that there was sufficient evidence to support the court's finding that the mother's failure to visit the children between April 1974 and December 1977 demonstrated her lack of interest. Unlike those cases where official acts of the Department prevented a parent from making contact (*e.g.*, *In re Taylor* (1975), 30 Ill. App. 3d 906, 334 N.E.2d 194), the evidence in this case indicates that the Department at first actively encouraged visitation by the mother only to have such suggestions rejected. In the 44 months from April 1974 to December 1977 on only two occasions did the mother indicate an interest in visitation, neither of which culminated in an actual visit. After the two December 1977 meetings with the boys, she made no effort during the next 2½ months to take advantage of the visits which were then authorized. Her failure to maintain a reasonable degree of interest in the children is clear. We think it significant the trial court made an express finding that Trine was the more credible and believable witness with regard to whether he told the mother not to try to visit her children. The credibility of witnesses is for the trier of fact to determine, and we have no basis for concluding that the trial court was wrong in believing Trine's version of the conversations rather than the mother's account.

We are persuaded that the evidence was sufficient to establish this mother's unfitness. The Department made a great effort to help the mother, and tried to teach her the minimal housekeeping and parenting skills necessary to maintain a safe and healthful environment for her children. At least two of the children required special education classes, and the mother admitted her inability to help them with school work. She repeatedly demonstrated her lack of concern for the children's welfare when they were in her custody, and afterwards she made almost no effort to see them or to make contact by phone or by mail. It has been held that poverty and lack of transportation cannot excuse a parent's lack of concern or interest for a child. (*In re Woods* (1977), 54 Ill. App. 3d 729, 369 N.E.2d 1356.) We believe that principle is applicable to the case at bar.

The trial court based the finding of unfitness upon the mother's lack of interest, concern, or responsibility, and we affirm that holding. The mother also argues that the evidence was insufficient to prove the

allegation that she failed to maintain a clean and healthy household while the children were in her custody from March 1973 to April 1974. However, that issue is not relevant to this appeal since the court did not find that allegation to have been proved. The same is true of the mother's contention that the trial court erred in refusing to admit into evidence a letter relating to the children's school attendance for the 1973-74 school year. Since the court did not base the mother's unfitness upon her failure to supervise properly their school attendance, the exclusion of her exhibit did not affect the result.

The mother also contends that it was unfair to terminate her parental rights for lack of effort to visit the children because the Department took custody unlawfully in 1974. Her argument is based upon the Department's alleged violation of a portion of section 5—8(3) of the Juvenile Court Act (Ill. Rev. Stat. 1977, ch. 37, par. 705—8(3)), which provides, in part:

"No legal custodian or guardian of the person may be removed without his consent until given notice and an opportunity to be heard by the court."

Since she had been awarded physical custody in 1973 by court order, she argues that the removal of custody in April 1974, without a hearing was unlawful.

As best we can determine from the record, the mother did not assert the violation of this statute in the trial court. She did plead as an affirmative defense that the Department removed the children from her custody "without legal authority and contrary to orders of this court," but there is no indication that the trial court had an opportunity to rule upon the applicability of the statute. Thus this issue was probably waived. In any event, we believe the statute does not apply to this situation where the Department continues to serve as legal guardian of the children as a result of the order entered in the neglect proceeding. In our view, any lack of diligence on the part of the Department in obtaining a new custody order after April 1974 was insufficient to invalidate these termination proceedings, and the mother obviously had actual knowledge of the removal of the children from her physical custody. We find no error.

The mother next contends that the proceedings to terminate her parental rights were a nullity because the Department was improperly represented by privately retained counsel instead of the State's Attorney. Section 1—21 of the Juvenile Court Act provides:

"The State's Attorneys of the several counties shall represent the people of the State of Illinois in proceedings under this Act in their respective counties." (Ill. Rev. Stat. 1977, ch. 37, par. 701—21.)

According to the record, special counsel originally entered his appearance

as co-counsel with the State's Attorney of Hancock County. The State's Attorney attended all proceedings and did not object to the appearance of special counsel. On one occasion, the State's Attorney stated to the court that he was representing the People, not the Department, but at no time did he take a position antagonistic to that of the Department. Under the circumstances, we believe the State's Attorney's consent to the appearance of special counsel can be inferred, thereby distinguishing this case from one where a department of State government seeks to deprive the Attorney General of his common law and constitutional powers to represent the State in court. (*E.g., Environmental Protection Agency v. Pollution Control Board* (1977), 69 Ill. 2d 394, 372 N.E.2d 50.) The propriety of permitting private counsel to assist the State's Attorney is a matter within the discretion of the trial court (*People v. Farnsley* (1973), 53 Ill. 2d 537, 293 N.E.2d 600), and that discretion was not abused here.

Finally, the mother contends that the trial court acted arbitrarily in fixing the fees of her court-appointed counsel at the rate provided for criminal cases in the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1977, ch. 38, par. 113—3(c)), which sets a rate of compensation of no more than $30 for each hour in court and $20 for each hour spent otherwise. The mother's attorney requested fees at the rate of $40 per hour. In its order the trial court found that the usual and customary attorney fees in the circuit for this type of work for nonindigent clients where the attorney was not court appointed was at the rate of $40 per hour, that the overhead expense for the mother's attorney for the work done in this case was in excess of $16 per hour, that all services performed were proper and necessary, that the usual and customary rate for fees allowed to attorneys representing indigents in juvenile proceedings in the circuit is $20 per hour for time spent out of court and $30 per hour for the time spent in court, and that here the mother's attorney spent 27 hours of in-court time and 37.56 hours out-of-court time, plus $65 expenses. The court then ordered payment of $1,626 fees and expenses.

The mother argues that the court acted arbitrarily, but we do not agree. It was not arbitrary for the trial court to fix the fees for a court-appointed attorney at an amount less than the usual compensation charged paying clients. (*Cf. In re Kersten* (1977), 52 Ill. App. 3d 815, 368 N.E.2d 138.) We find no abuse of discretion in the allowance of attorney's fees.

For the reasons stated, we conclude that the orders of the Circuit Court of Hancock County in this cause should be affirmed.

Affirmed.

BARRY, J., concurs.

Mr. PRESIDING JUSTICE STOUDER, specially concurring:

While I agree with the majority that the trial court's order should be affirmed, I must disagree with its decision regarding whether or not the Department of Children and Family Services (DCFS) may be represented by private counsel. I believe it cannot be so represented. The majority fails to deal with this problem, merely stating that there is no violation of section 1—21 of the Juvenile Court Act because the record indicates that special counsel appeared as "co-counsel" with the State's Attorney of Hancock County and that both appeared on behalf of DCFS. However, the record belies this assertion. The State's Attorney, Mr. Corcoran, specifically stated he was not in court on behalf of DCFS. Nor did the State's Attorney participate in the proceeding in any respect. Therefore, the private counsel for DCFS can in no way be considered to be co-counsel with the State's Attorney for DCFS.

The second amended petition for DCFS was filed by private counsel, who did not purport to be anything other than private counsel. Further, the funds to pay the private counsel came from DCFS, not the State's Attorney's office. Under these circumstances, I do not believe that the State's Attorney can be said to have consented to an appointment of private counsel by DCFS.

Thus, we are confronted by the question of whether it was proper for DCFS to be represented by private counsel. I believe it was not proper. This case is virtually identical with *Environmental Protection Agency v. Pollution Control Board* (1977), 69 Ill. 2d 394, 372 N.E.2d 50. In that case the court held that the Pollution Control Board could not be represented by private counsel in the absence of appointment of such counsel by the court or the Attorney General and that the appointment must be made for reasons listed in section 6 of "An Act in regard to attorneys general and state's attorneys" (Ill. Rev. Stat. 1975, ch. 14, par. 6). The court reasoned that, under the 1970 Constitution, the Attorney General is " 'the law officer of the people, as represented in the State government, and its only legal representation in the courts.' " (69 Ill. 2d 394, 398, quoting *Fergus v. Russel* (1915), 270 Ill. 304, 337.) Neither the legislature nor the judiciary may deprive the Attorney General of his common law powers under the Constitution. Thus, the court stated, permitting private counsel to represent the Board would deprive or lessen the Attorney General's powers or duties and could not be permitted.

In the instant case, DCFS is a department of the government of the State of Illinois. (Ill. Rev. Stat. 1977, ch. 127, par. 2.) Section 1—21 of the Juvenile Court Act (Ill. Rev. Stat. 1977, ch. 37, par. 701—21) permits the State's Attorney of the county to represent the People in these proceedings. Thus, only the Attorney General or the State's Attorney may represent the department in the absence of special circumstances enumerated

in section 6 of "An Act in regard to attorneys general and state's attorneys" (Ill. Rev. Stat. 1977, ch. 14, par. 6). This section states:

> "Whenever the attorney general or state's attorney is sick or absent, or unable to attend, or is interested in any cause or proceeding, civil or criminal, which it is or may be his duty to prosecute or defend, the court * * * may appoint some competent attorney to prosecute or defend such cause * * *." Ill. Rev. Stat. 1977, ch. 14, par. 6.

In the instant case, none of the above circumstances are present nor did the Attorney General or State's Attorney consent to special counsel. Therefore, it is clear that DCFS could not be represented by private counsel.

Although DCFS could not be represented by private counsel, I do not believe that this prejudiced appellant and would not reverse the trial court for this reason alone. Therefore, I also vote to affirm the trial court's order.