44 Ill. App.3d 260 (1976)
357 N.E.2d 815
In re LISA HURLEY et al., Minors.  (THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee,
v.
HILDEGARD HURLEY FAY, Respondent-Appellant.)
No. 75-213.
Illinois Appellate Court  Second District (2nd Division).
Opinion filed November 29, 1976.
*261 Ralph Ruebner, of State Appellate Defender's Office, of Elgin, for appellant.
John J. Bowman, State's Attorney, and Frank Wesolowski, Jr., Public Defender, both of Wheaton (Edmund P. Bart, Assistant State's Attorney, of counsel), for the People.
Reversed in part, and reversed and remanded in part.
Mr. PRESIDING JUSTICE THOMAS J. MORAN delivered the opinion of the court:
Respondent, Hildegard Hurley Fay, appeals from the circuit court's order which terminated her parental rights to her children, Lisa and Robert Hurley, appointed the Department of Children and Family Services as guardian of the minors with authority to consent to their adoptions, and vested custody of the children in the father, Frederick Hurley. Respondent claims that the order is against the manifest weight of the evidence.
Respondent was divorced in 1971. In 1972, upon reports from school officials and others concerning the well-being of the respondent's five children[1] and on the recommendation of the Du Page County Probation Department, the State's Attorney filed a neglect petition pursuant to the Juvenile Court Act. (Ill. Rev. Stat. 1969, ch. 37, par. 702-4(b).) Youth warrants were issued and the children were removed from the respondent's home. At a detention hearing the next day, testimony, some of which was hearsay, indicated that the respondent had not sent one of *262 her children to school, had not provided proper medical care for one child, and was leading a nonexemplary life in that she used profanity in the children's presence and had had trouble with the police. There was no evidence that the children were physically abused or suffered from malnutrition.
The court held that probable cause existed to support a finding of neglect and ordered the children removed from respondent's custody. Respondent did not appeal the court's order. (The children, Lisa, 8, and Robert, 4, were placed in a foster home and have remained there throughout this case.) During the next two weeks, the respondent reportedly threatened to harm the children's custodians. As a result, the court entered a protective order which prohibited respondent from contacting the children or the foster parents except through the probation officer or her attorney. In March, 1973, following a hearing, the court found Lisa and Robert to be neglected minors and made them wards of the court. At the dispositional hearing in May, 1973, the court found the respondent unfit to have custody of the children in that she failed to maintain a reasonable degree of responsibility as to each child's welfare, and had engaged in misconduct toward each child by failing to control her impulses in their presence. The court also found the natural father, Mr. Hurley, to be unable to assume custody. Guardianship was placed in the Department of Children and Family Services (the Department). In addition, the court reinstated its protective order and directed the respondent not to contact the foster parents or any other person charged with the care and treatment of the children without approval of the Department's caseworker.
On August 29, 1973, the foster parents petitioned the court for guardianship of the children, alleging that the Department had failed to exercise its position as guardian, and requested that the respondent be permitted supervised visits with the children. On September 7, the court ordered the Department to provide, within five days, a schedule of visitations for the respondent, and further ordered that should the respondent fail to attend scheduled visitations without giving the caseworker notice in advance, no more visits would be permitted until ordered by the court. On October 26, 1973, the respondent petitioned the court to force the Department to show cause as to why they should not be held in contempt for failing to provide the ordered schedule of visitations. The petition stated that on two occasions since the order was entered, the Department had been so indecisive about the time and place of the visits that the respondent had been unable to meet with the children.
In May of 1974, the Department petitioned the court seeking to terminate its guardianship responsibility, and requested that guardianship be placed in the natural father, Mr. Hurley, with custody to remain in the *263 foster parents. Three months later, Mr. Hurley filed a petition requesting the court to terminate his parental rights as to the minor, Robert, and to appoint a guardian with power to consent to the adoption of the child. That same day, Mr. Hurley filed his answer to the Department's petition and refused the Department's offer to serve as Robert Hurley's guardian. No immediate action was taken on these petitions.
Finally, on October 24, 1974, the State's Attorney filed a petition pursuant to the Juvenile Court Act (Ill. Rev. Stat. 1973, ch. 37, par. 705-9) to terminate the parental rights of both the respondent and the natural father. At the termination hearing, Mr. Hurley sought the custody and guardianship of Lisa, but did not contest the petition for termination of his parental rights as to Robert. Respondent sought custody of both children. The court heard testimony from the foster mother (Judith Probeck), four caseworkers, Mr. Hurley, respondent's mother, and the respondent.
Mrs. Schnabel, a Du Page County probation officer assigned to the case from October, 1972, to July, 1973, testified that, immediately following the removal of the children from respondent's custody, they were placed together in a foster home because Robert did not want to be separated from Lisa. She stated that visitations were scheduled at the respondent's request, but all visits had to be held at the probation department office because of the court order restricting respondent's contact with the children. Visits were scheduled three or four times a month during this period. Respondent was present at each visit, unless she had, in advance, informed the caseworker she could not make it. At times the respondent expressed her irritation at having to visit the children in the probation department environs. Mrs. Schnabel testified that she did not encourage respondent to visit the children more often, but that she set up the visitations whenever the respondent requested. According to Mrs. Schnabel, the respondent gave the children presents at Christmas, 1972, and that on almost every visit, she brought the children small gifts. Respondent sent the children cards and letters fairly often, and called Mrs. Schnabel frequently. At Easter, respondent gave $10 to buy shoes for Lisa. When asked if she had a recommendation for the children's further placement, Mrs. Schnabel responded only that they should remain together.
Ms. Kyle, of the Department of Children and Family Services, was the next caseworker assigned to the case, working on it from May, 1973, to April, 1974. During this period about 12 visits were scheduled with the children at respondent's request. The witness testified that the respondent attended three or four of these scheduled visits, though in a report filed with the court on May 7, 1974, the witness stated that the respondent attended two-thirds of the scheduled visits. The other visits were *264 cancelled by the respondent for various reasons including lack of transportation. The witness testified that respondent found the visits to be emotionally hard. Respondent attended some counseling sessions with the agency. She attempted to come up with plans to obtain custody of the children, but never followed through with them, and told the caseworker that she felt the initial decision of the court, removing the children from her custody, was unjust, and she could not see proceeding with plans as long as there was court control of the situation. Ms. Kyle felt that the respondent was sincere in this statement. The witness said she encouraged respondent to see the children more often, but was not very successful; that the respondent spoke with her on the phone at least once a week inquiring about the children's well-being; and that she had a phone number where she could contact the respondent. The respondent gave the caseworker gifts to be passed on to the children about once every four months, and also sent the children cards and letters. During the latter part of the year Ms. Kyle worked on the case, the respondent had obtained employment and appeared to be making progress economically.
Craig Hjorth served as a caseworker from April, 1974, to October, 1974. He testified that respondent would call him once a month and converse for an hour or so about various matters, and that at one time she indicated she did not want any further involvement. During this five-month period, Hjorth was unable to contact respondent because respondent gave him no address or telephone number. He did not know whether respondent saw the children or gave them gifts during this time. The foster mother testified, however, that respondent visited with the children at the respondent's mother's home once during that summer.
Irene Birks, who succeeded Hjorth in October of 1974, testified that she had no problem contacting respondent during the remainder of the year. After the petition to terminate was filed, respondent requested that visitations be arranged. She visited with the children at the foster home without supervision in October and November, 1974, and sent a card to the children after the October visit. She again visited the children in November and December, although this time the visits were supervised. A visitation was scheduled for Christmas, 1974, but respondent did not attend. She did, however, visit her children at her mother's home on New Year's Day. Ms. Birks said she encouraged respondent to see her children and she felt the encouragement was successful.
The foster mother, Judith Probeck, stated that the respondent was not supposed to visit the children at her home because of the prohibition of the court order, but that, despite the court order, respondent visited the children in the foster home several times. The foster mother testified *265 that respondent attended about half of the scheduled visits between October, 1972, and December, 1973. During the children's stay at the foster mother's home, Lisa stayed at her aunt's house on a number of weekends and visited her father, who lived several blocks away in an apartment. When Mr. Hurley picked Lisa up at the foster home on weekends, he seldom visited with Robert. Mrs. Probeck's testimony indicated that despite Mr. Hurley's interest and concern for Lisa, he showed little or no concern, love or affection toward Robert during this period. Robert accompanied Lisa to Mr. Hurley's sister's only once, and though he asked to go with Lisa on other occasions, Mr. Hurley refused. Mrs. Probeck testified that Mr. Hurley's sister felt badly that Robert could not accompany Lisa, but that Mr. Hurley had told his relatives not to let Robert visit them. Mrs. Probeck said she spoke to the children about the possibility of being separated, and that both children were very upset at such a prospect. Lisa told Mrs. Probeck that Robert was all she ever had.
Respondent testified that she believed she should have custody of Lisa and Robert because she was their mother. She said she had made arrangements with her mother to take custody of the children until she was ready to assume the responsibility, but that she could not stay with them because of a disagreement between her and her mother. Respondent's mother confirmed this tentative arrangement. The respondent was employed as a hairdresser between April of 1974 and August of 1974, and had worked as a security officer from October, 1974, to the time of the hearing. She stated that her visits with the children were hard on them because they became upset when she had to leave without them. Respondent believed the Department could have contacted her at any time; that she had always called them; and that they never called her. Respondent was on probation for 2 1/2 years, had just been released, and had not been arrested since being placed on probation.
Mr. Hurley testified that he was engaged to a 23-year-old woman and planned to marry her the week after the hearing. He was employed by a utility company for 22 years and worked part time as a bartender. He testified that he had visited Lisa 10 times during 1973 and 15 times during 1974, picking her up at the foster home on Friday and bringing her back on Sunday. Mr. Hurley stated that he believed he was a fit person to have the custody of Lisa and that his fiancee expressed no hesitancy about his obtaining custody and guardianship of her, but that he did not believe he could give Robert the tender love and affection of a father, basing this feeling on a question he had regarding Robert's paternity.
The trial judge spoke to the children in chambers. Lisa told the judge that her first preference would be to stay with her father and then her mother, but in either case, she wanted Robert to come. There was little *266 testimony to indicate whether it would have been in the children's best interest to separate them. It was apparent that both the court and foster mother recognized that separation would be traumatic.
Two months after the hearing, the trial court ordered the Department to remain as guardian of the children; that custody of both children be transferred to Mr. Hurley at the close of the school year; that neither child be separated from the other or placed with relatives of either family; and that the parental rights of the respondent be terminated.
 1 The respondent contends the court's finding of unfitness, pursuant to the State's petition, is not supported by the evidence and must be reversed. We must recognize that cases of this type are in effect sui generis and each of them must be decided in accordance with the particular facts of each individual and varying situation. (In re Grant (1975), 29 Ill. App.3d 731, 736.) Unlike child custody cases, wherein wide discretion is vested in the trial judge (In re Martin (1975), 31 Ill. App.3d 288, 293), the termination of parental rights must be supported by clear and convincing evidence. (In re Ybarra (1975), 29 Ill. App.3d 725, 729; In re Overton (1974), 21 Ill. App.3d 1014, 1018.) Though the evidence may indicate the mother is not fit to have custody of her children, it does not automatically follow that she is not fit to be their legal mother with attendant rights and privileges.
As evidenced by the court's memorandum in support of its order, the court based its finding of unfitness primarily on the fact that respondent had not changed her conduct, attitudes, or posture relative to the fulfillment of her responsibilities toward the children; that she had not demonstrated proper restraint with regard to her conduct in the presence of her children; and that she had demonstrated little or no effort toward rehabilitation. The issue before the court, as set forth in the State's petition, was not whether respondent had made reasonable effort to correct the conditions which were the basis for the removal of custody in the first place. (Ill. Rev. Stat. 1973, ch. 4, par. 9.1-1D).) Rather, the issue was whether she failed to maintain a reasonable degree of interest, concern, or responsibility toward the children's welfare. (Ill. Rev. Stat. 1973, ch. 4, par. 9.1-1D(b).) In this respect, it is respondent's efforts to carry out her parental responsibilities, rather than her success, which should be considered in determining the correctness of a finding of unfitness under section 1D(b) (par. 9.1-1D(b)). Cf. In re Taylor (1975), 30 Ill. App.3d 906, 909.
From October, 1972, to April, 1973, visitations were arranged three or four times a month. The caseworker testified that respondent was in attendance at each visit unless she had informed the caseworker she could not be there. In the latter half of 1973, and early 1974, the frequency of the respondent's visitations slacked off. Respondent indicated to the *267 caseworker that the visits were emotionally hard for her and that at times she lacked transportation. During this one-year period, however, the respondent had telephone conversations with the caseworker once a week. The caseworker testified that respondent inquired about the children's well-being every time she called. In the summer of 1974, respondent visited her children once at her mother's home. In the months immediately preceding the hearing, the respondent requested more visits with her children. She visited them twice at the foster parents' home. During November and December, she had caseworker-arranged visits with them and she visited them again on New Year's Day without prearrangement. The caseworker said she encouraged respondent to see her children, and she felt her encouragement was fairly successful. Respondent testified that the visits were very hard on the children. Despite the respondent's intermittent contact with the children, she maintained contact with the caseworkers throughout the entire period. Except for Mr. Hjorth, the caseworkers had no difficulty in contacting the respondent. Generally, throughout the period, respondent continued to express concern for the children's well-being. She expressed the belief that she had been unjustly deprived of her children in the first place, and that she could never regain their custody as long as the court was in control of the situation. Her concern, interest and responsibility toward the children was demonstrated not only by her constant contact with the caseworkers, but also by her giving the children money and gifts, and sending them cards and letters from time to time, as well as her visitations with them. It should also be noted that all visitations were initiated by the respondent with the court's permission, and that at one point she petitioned the court in order to force the Department to comply with the court's order that a schedule of visitations be provided.
The record indicates that the respondent is a highly emotional and independent person. Actions spawned by her temperament caused the court to ban her from having any direct contact with the foster parents or children. Respondent underwent brief counseling at the Department and attempted to execute plans to regain the children's custody but was not successful in carrying through on them. At the hearing, the respondent testified she had made plans for her mother to take custody of the children until she was ready to assume such responsibility, although she would not be permitted to live with them.
 2 Though the record is replete with evidence of respondent's shortcomings and failures, it is her efforts to carry out her parental responsibilities, and not her success, by which fitness is to be determined pursuant to section 1D(b) of the Adoption Act. (Ill. Rev. Stat. 1973, ch. 4, par. 9.1-1D(b).) Based on the record before this court, the evidence does not clearly and convincingly demonstrate that respondent has failed *268 to maintain a reasonable degree of interest, concern, or responsibility toward the welfare of her children to warrant the termination of her parental rights. Accordingly, we reverse that part of the trial court's order which terminated respondent's parental rights to the minor children here involved and authorized the Department to consent to their adoption.
In addition to terminating the respondent's parental rights, the court transferred the custody of both children from the foster parents to respondent's former husband, Mr. Hurley, and ordered the Department to remain as guardian. Respondent contends the order transferring custody is against the manifest weight of the evidence and must be reversed.
 3 It is not the function of this court to substitute its judgment for that of the trial court. (In re Gonzales (1974), 25 Ill. App.3d 136, 144.) Orders with respect to custody will be disturbed only if they are against the manifest weight of the evidence or result in a manifest injustice. In re Martin (1975), 31 Ill. App.3d 288, 293.
We find that the order transferring Robert's custody to his father to be against the manifest weight of the evidence. The record clearly indicates that Mr. Hurley wanted no parental responsibility with respect to Robert. In August, 1974, Mr. Hurley filed a petition seeking to terminate his parental rights as to Robert. That same day, in an answer to the Department's petition, he refused to accept the Department's offer of guardianship with respect to Robert. At the hearing, Mr. Hurley did not contest the State's petition to terminate his parental rights with regard to Robert, and further stated that he did not believe he could give Robert the love and affection of a father because he did not believe Robert was his son. Mr. Hurley's attitude toward Robert was corroborated by the foster mother's testimony that indicated Mr. Hurley showed little or no love or affection toward Robert, refused to allow him to accompany Lisa, and refused to visit Robert when he picked Lisa up on weekends. In granting Mr. Hurley custody of both children the court noted that Mr. Hurley had sought to have his parental rights to Robert terminated, but believed Mr. Hurley could learn to love Robert. It is evident that the court's ruling was influenced by Mrs. Schnabel's and Probeck's statements with regard to separation and by the court's own recognition that separation would be traumatic. The manifest weight of the evidence, however, indicates that Mr. Hurley did not want custody of Robert.
 4 The evidence indicates that Mr. Hurley is willing and able to assume Lisa's custody, but this does not mean he is entitled to her custody as a matter of statutory law. The Juvenile Court Act provides that "[t]he parents' right to the custody of their child shall not prevail when the court determines that it is contrary to the best interests of the child." (Ill. Rev. Stat. 1973, ch. 37, par. 701-2(3)(c). See also People v. Hoerner (1972), 6 Ill. App.3d 994, 996; In re Gonzales (1974), 25 Ill. App.3d 136, 143.) In *269 light of our finding with respect to the custody of Robert and the lack of evidence concerning the best interests of the children with regard to separation, we reverse the trial court's order transferring custody of both children to the natural father.
The trial court is directed to conduct a complete new hearing to determine who should serve as custodian of each child. Any new and relevant evidence should be considered by the court in making its determination. Our opinion does not preclude the respondent or any other individual from being considered by the court for custodial responsibilities.
Accordingly, the order of the trial court terminating the parental rights of respondent is reversed, and the order transferring custody to the natural father is reversed and remanded with directions.
Reversed in part; reversed and remanded in part with directions.
RECHENMACHER and DIXON, JJ., concur.
NOTES
[1] This appeal involves only two of the five children.