*In re* DOROTHY WRIGHT *et al.*, Minors (The People of the State of Illinois, Petitioner-Appellee, v. Barbara Wright, Respondent-Appellant).

Fifth District   No. 5—84—0432

Opinion filed April 25, 1986.

HARRISON, J., dissenting.

Robert M. Wolf and Patricia E. Rochford, both of Harrisburg, for appellant.

David W. Hauptmann, State's Attorney, of Harrisburg (Kenneth R. Boyle, Stephen E. Norris, and Frank M. Howard, all of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE JONES delivered the opinion of the court:

This is an appeal from two contemporaneous orders of the circuit court of Saline County finding respondent, Barbara Wright, to be an unfit parent to her minor children, Dorothy and Joseph Wright, terminating all of her parental rights over those children, and granting to the guardianship administrator of the Department of Children and Family Services the power to consent to their adoption. The first of these two challenged orders pertains exclusively to Mrs. Wright's daughter, Dorothy; the second, identical in language, applies solely to her son, Joseph. In each case the trial court's determination that respondent was not a fit parent was predicated upon a finding that she failed to maintain "a reasonable degree of interest, concern or responsibility" toward the welfare of her respective children. Respondent contends that that finding was not supported by clear and convincing evidence. Respondent further argues that any failure on her part to maintain a "reasonable degree of interest, concern or responsibility" toward her children was caused by official acts of the Department of Children and Family Services itself and cannot therefore serve as the basis for termination of her parental rights on grounds of lack of fitness.

The record reveals that Dorothy Wright was born on August 20, 1978, and that Joseph Wright was born on February 22, 1980. Respondent, Barbara Wright, is the natural mother of both children. Clarence Wright, respondent's husband, is their natural father.

On March 18, 1983, the Department of Children and Family Services (hereinafter referred to as DCFS) filed a petition for adjudication of wardship, alleging that Dorothy and Joseph were being neglected by their parents in violation of section 2—4(1) of the Juvenile Court Act (Ill. Rev. Stat. 1983, ch. 37, par. 702—4(1) and requesting that the children be made wards of the court. DCFS decided to file this petition after conducting an investigation, based on a tip from an anonymous source, which showed that the house trailer where the Wrights lived in Eldorado, Illinois, was dirty and contained inadequate food, that there was lack of adequate supervision of the children, that the children and their clothing were filthy, and that the children were sleeping on a bare mattress on the floor.

Ten days later on March 28, 1983, a brief hearing was held before the circuit court of Saline County, at which the State's Attorney and

Barbara and Clarence Wright agreed to continue the adjudication hearing for nine months, during which period DCFS was to maintain supervision of the household including "periodical visits, counseling, and generally whatever help might be necessary for this family." In addition, the court appointed Ms. Krystal Tison as guardian *ad litem* for Dorothy and Joseph Wright. The agreement for continuance was entered into pursuant to section 4—7(4) of the Juvenile Court Act (Ill. Rev. Stat. 1983, ch. 37, par. 704—7(4)), which empowers a court to leave minors in their own home during the period of a continuance.

The court's formal order for continuance under supervision was dated March 28, 1983, and filed on March 30, 1983. The court advised the parents that if they cooperated with DCFS and made the necessary corrections to DCFS' satisfaction by the end of the nine-month period, the petition for adjudication would presumably be dismissed. Dorothy and Joseph were permitted to remain in their parents' home. No conditions, other than DCFS supervision of the household, were imposed by the court.

On May 31, 1983, DCFS filed a petition to terminate the order for continuance under supervision. This petition alleged that respondent had left the children with their father "and left for parts unknown," that the father had been hospitalized for an extended period in Jefferson Barracks Veterans Hospital in Missouri, and that no other family members were able or willing to care for the children. A hearing on this petition was convened the following day, June 1, 1983.

Neither parent was present at the hearing, apparently having received no prior notice of it. The sole testimony was given by Vivian Robinson, a DCFS child-welfare worker assigned to the case, who stated that respondent had left town "a couple of months ago" without leaving an address or indicating when she would return. Ms. Robinson stated that respondent had left a note with her husband telling him that she was leaving and that she was giving the children to him.

When respondent departed, the children went to stay with an aunt, their father's sister, Lena. Unfortunately, the aunt found that she could not properly care for the children and was unwilling to continue to do so. Approximately one or two weeks prior to the hearing, and apparently unknown to respondent, respondent's husband found it necessary to admit himself to a veterans administration hospital in St. Louis, Missouri. The only other relative in the vicinity known to DCFS was the children's grandmother, who advised DCFS on the morning of May 31, 1983, that she could not care for the children either. Accordingly, DCFS proceeded to place the children in a foster

home. This was done without consultation with the father and without investigation by DCFS as to the length of time he was expected to be hospitalized.

Based upon this testimony, and without objection by the guardian *ad litem*, the circuit court ordered that supervision be terminated and that Dorothy and Joseph be placed in the temporary custody of the guardianship administrator of DCFS. The court further instructed DCFS to contact the father to ascertain "what his attitude is." Ms. Robinson, on behalf of DCFS, stated that she would write him a letter explaining the situation and advising that "we understand that he is sick and needs to be in the hospital, that we can take care of them [the children] until such time as he can get well and provide a good, safe, secure home and income and this type of thing for the children."

Nearly four months later, on September 27, 1983, a hearing was held on whether Dorothy and Joseph should be adjudged wards of the court. Present were Clarence Wright, *pro se*; respondent, Barbara Wright, and a public defender who had been appointed to represent her; the State's Attorney on behalf of DCFS, and Ms. Tison, the guardian *ad litem*. At this hearing the parties advised the court that they had reached an agreement on disposition of the action. The agreement provided that Clarence and Barbara Wright would admit that their children were neglected as alleged in the original petition for adjudication of wardship and that all parties would request an adjudication of wardship. The parties further agreed to a disposition of the children consisting of placement of their custody and guardianship with the guardianship administrator of DCFS. The court adopted this agreement, and on September 30, 1983, it signed and filed orders of adjudication making Dorothy and Joseph wards of the court. The parents, Clarence and Barbara Wright, understood the agreement reached on September 27, 1983, to mean that Barbara retained the right to petition the court to terminate the wardship and have the children returned to her if her home and living conditions were made satisfactory to the court, and this understanding was expressly conveyed to the court.

Subsequently, on March 27, 1984, DCFS filed supplemental petitions pursuant to section 4—1 of the Juvenile Court Act (Ill. Rev. Stat. 1983, ch. 37, par. 704—1), requesting that respondent be declared an unfit parent as described in section 1D of the Adoption Act (Ill. Rev. Stat. 1983, ch. 40, par. 1501D), and pursuant to section 5—9 of the Juvenile Court Act (Ill. Rev. Stat. 1983, ch. 37, par. 705—9), praying that the guardianship administrator of DCFS be appointed guardian of Dorothy and Joseph with the power to consent to their

adoption. These supplemental petitions followed a decision by the children's father in January 1984 to surrender voluntarily all parental rights over them to DCFS and to grant DCFS the power and authority to consent to their legal adoption. In its supplemental petitions, DCFS alleged respondent was "unfit" within the meaning of section 1D of the Adoption Act for three reasons: (a) because she abandoned the children, (b) because she failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the children, and (c) because she had deserted the children for more than three months prior to the filing of the supplemental petitions.

In early June 1984, the circuit court heard testimony in support of and in opposition to the DCFS supplemental petitions. DCFS' principal witness was Ms. Vivian Robinson, the same DCFS child-welfare worker who had testified at the June 1, 1983, hearing on the petition to terminate the order for continuance under supervision and the official who had signed the supplemental petitions on behalf of DCFS. Ms. Robinson recounted the events of the spring of 1983 leading to the initial placement of Dorothy and Joseph in foster care, adding additional details. Ms. Robinson stated that respondent left Eldorado in April 1983, leaving the children with her husband's sister, Lena, where they remained until May. Thereafter, the children spent a few days with their grandmother prior to being placed in foster homes by DCFS.

Respondent apparently returned to town a short time later and met with Ms. Robinson on June 28, 1983. During that meeting Ms. Robinson advised respondent that if she wanted to regain custody of the children she would have to meet certain "goals," including providing a home and food. She also added that it would be "a good idea" for respondent to take "parenting" classes. On July 1, 1983, at respondent's request, respondent met with the children in Ms. Robinson's office. Ms. Robinson stated that respondent showed no affection for the children but admitted that she was not present at all times during respondent's visit with her children.

The precise "goals" established by Ms. Robinson at the June 28 meeting which respondent was to meet in order to regain custody of her children are unclear. She subsequently testified that she explained to respondent that if respondent wanted to get her children back "she should get a house or a place to live and get a job, some kind of income, medical services and I recommended parenting classes to her." Ms. Robinson stated that she wrote down these "goals" for respondent and discussed them with her at subsequent meetings in July and September. She also retained a copy for her files, but it was not pro-

duced at trial.

Following the July 1, 1983, meeting, Ms. Robinson heard nothing further from respondent until about September 21, when she, Ms. Robinson, advised her that there was to be another court hearing in the latter part of September. Respondent did not at that time request a visit with her children. After the September 27, 1983, court hearing at which the agreed adjudication of wardship noted above was entered, Ms. Robinson next saw respondent in the first or second week of November when respondent stopped by her office to say that she was going to get straightened out. Respondent was not seen thereafter until March 14, 1984. Neither at the November meeting nor at any other time before March 14, 1984, had respondent asked for a visit with the children, shown any interest in them, or even asked how they were doing. Recalled as a witness later in the proceeding, Ms. Robinson gave further details regarding the November 1983 meeting with respondent. She related that respondent and Mr. Wright had come to her office together to talk "about [sic] they were going to get things straightened out and everything." At that time only Mr. Wright had requested a visit with the children. Although respondent was present at the time, she did not request a visit. Following this meeting, Ms. Robinson set up a visitation with the children for both of the parents but neither respondent nor Mr. Wright appeared. Mr. Wright had come to Ms. Robinson's office later to explain that he could not make the visitation because he had been in jail on a traffic offense and that respondent had not made the visitation because she had gone to Kentucky with another man. At the meeting on March 14, Ms. Robinson told respondent that DCFS was filing a petition to terminate her parental rights. When told that, respondent expressed no emotion. At that same meeting Ms. Robinson told respondent she should see a lawyer if she had any interest in her children. Sometime in April respondent asked Ms. Robinson for a visit with the children but, because of a DCFS policy that denies parental visitation after the filing of a petition to terminate parental rights, respondent's request was denied.

On cross-examination at the June 1, 1984, hearing, Ms. Robinson admitted that it was part of her job to set up "parenting" classes and supervise the home as well. She had not, she stated, been able to set up any "parenting" classes for respondent because she had been unable to find her. Respondent had given her the telephone number of Terry Vailes, and when Ms. Robinson called she found it to have been disconnected. Respondent had also given Ms. Robinson an address of a commercial hotel, but when she called her, the respondent had

moved. Ms. Robinson also sought to locate respondent through the Illinois Department of Public Aid, to no avail. She also had checked with the Wright family, but they did not know respondent's whereabouts.

On cross-examination by the guardian *ad litem* for the children, Ms. Robinson stated that she had made it clear to respondent that following the adjudication of wardship on September 30, 1983, she would be able to visit with the children on request.

According to Ms. Robinson, respondent did not request visitation with her children at any time between September 1983 and March 14, 1984. During this period Ms. Robinson claims that respondent did not call or write to the children, attempt to contribute to their support, or send them Christmas or birthday cards. Later in the proceedings, however, Ms. Robinson stated that respondent visited Dorothy in her office on September 27, 1983, the day of the adjudicatory hearing.

After Ms. Robinson completed her testimony, DCFS called Clarence Wright as its final witness. Mr. Wright testified that he was respondent's husband but that the two had been separated for approximately one year. According to Mr. Wright, he and respondent had visited DCFS' office in November 1983 to set up a visit with their children. The visit was scheduled for the following month, but he was unable to attend because he had been arrested for a traffic offense. Mr. Wright stated that he had voluntarily relinquished his parental rights because of a nervous condition and because of his employment. When asked about respondent's skills as a parent, Mr. Wright stated, "I couldn't say she was a worthy mother for them." On cross-examination, however, Mr. Wright admitted that this assessment was based on observations ending a year earlier.

Respondent's case proceeded next with testimony by Terry Vailes, a friend of respondent's for the past six years. Vailes stated that respondent "talks about her kids a lot and everything like that like she really loves them, you know, and everything, only she would know that, you know, if she loves them or not, I mean she talks a lot about them and told us how they lived and everything like that, you know." He further testified that he had personally taken respondent to the DCFS office on five different occasions so she could arrange to visit her children. The last time he did so was three weeks prior to the hearing. Vailes admitted that he went into the DCFS office with respondent on only the first of these five trips. He recalled this as being in October, although the precise date was disputed. Vailes testified that he and respondent had met with Ms. Robinson at this time and that "I didn't hear Vivian [Ms. Robinson] say no you couldn't have the

kids, you know, or you couldn't see your kids but Vivian just told her, you know, that she didn't show no response to her kids or anything and asked her why she would even want her kids, you know, Barb told her she wanted her kids because she loved them, you know, and it just led from one thing to another about how come she wanted her kids and how her trailer was dirty and everything like that."

Vailes testified that he had observed positive changes in respondent over the preceding four- to five-month period. He reported that he had helped her obtain general assistance, had aided her in looking for a job, and had provided her with transportation to obtain food stamps, to go to the store, and to pay her monthly bills. Vailes reported that respondent had become a more responsible person over the past six months, had attended church on at least one occasion, and had improved her personal appearance.

According to Vailes, respondent had moved to Harrisburg from Carrier Mills approximately six to seven months earlier. After moving to Harrisburg she found housing and has resided in her present home for the past two months. Vailes described the home as clean and said that respondent had become a good housekeeper.

Vailes' testimony was followed by that of Donna Yother, with whom respondent had lived in Carrier Mills prior to moving to Harrisburg. Yother is Vailes' mother-in-law. Respondent had moved in with Yother approximately one year earlier because she had no income and no other place to stay. She remained there until February 1984. Yother testified that respondent helped take care of Yother's minor children, ages 12 and 10, while Yother was sick and that respondent also helped take care of Yother's grandchildren. In Yother's opinion respondent was capable of caring for her own children at that time but lacked the financial resources to do so. Yother stated that respondent talked about her children quite a bit and complained of being unable to see them. She stated that respondent's husband did not contribute to her support and that respondent has attempted to find employment. According to Yother, when respondent was living in Carrier Mills, respondent traveled on foot to Harrisburg on several occasions to visit the DCFS office. Yother testified that respondent has developed a better outlook on herself and has taken greater care of herself and her home. Yother had visited respondent's present home as recently as the morning of the hearing and testified that it was suitable for children and is clean. Yother stated that respondent has worked to get a suitable home in order to get her children back.

Testimony was then given by respondent herself. Respondent stated that she was 24 years old and confirmed that she had resided

in her present home in Harrisburg for two months. Respondent said that she had moved out of the Yother home because she though she would have a better chance of supporting herself and getting her children back if she were in a home of her own. Respondent's present home, which she is renting, was described as containing two bedrooms, three beds, two dressers, a refrigerator, a stove, couch, chairs, and miscellaneous other furnishings. The rent is $175 per month. Her present income consists of $144 per month in general assistance and $72 per month for food stamps. She also gets help with her rent from Terry Vailes. Vailes does not reside at the home with respondent, but respondent stated that they are in love and plan to marry as soon as she is divorced from her husband, Clarence. In addition to finding a home, respondent testified that she had also looked for work. After April 1983, she sought employment through the State job service, which she contacted once a month.

Respondent stated that she had attended one "parenting" class in February or March 1983 but had attended no other classes since October 1983 because she had no transportation to get there. Respondent reported that she went to the DCFS office in October 1983, at which time she advised Vivian Robinson of her address. She returned to that office in mid-March 1984 after learning that a court hearing had been set. Respondent asked Ms. Robinson if she could visit with her children but was denied permission on the grounds that DCFS was going to have her parental rights terminated. Respondent stated that Ms. Robinson had visited her home a month or so prior to the hearing to advise her of the court date. In addition, respondent said that after the March 1984 visit she made five successive trips to the DCFS office in attempts to see her children but on each occasion was again denied permission on the grounds that her parental rights were being terminated.

Respondent recalled that, between July 1983 and the September 1983 adjudicatory hearing, she twice walked from Carrier Mills to Harrisburg to try to arrange visits with the children. These attempts were unsuccessful. Respondent did admit that arrangements had been made for her and her husband to visit the children in December 1983 but that she did not appear. She explained, however, that she had just "split up" with her husband at that time and had no transportation to get to the DCFS office. Respondent testified that she loves her children and wants them back.

On cross-examination, respondent revealed that she had a third child, named Christopher Wright, whom she had not seen in seven years. Christopher was born during her marriage to Clarence, but

Clarence was not the father. Christopher went to live with respondent's mother in Ohio because respondent and her husband could not support him when he was younger. She has not seen him because she had no transportation to get there but candidly admitted that she had not called or written to him either. Respondent explained that her mother would not now allow her to have Christopher back.

When questioned as to why respondent gave her children to her husband, Clarence, in April 1983 and left town, respondent stated that she had been helping the Eldorado police department to make drug arrests in order to earn money to support herself and her children. Her identity apparently became known to some of the individuals she had helped arrest, and she and her children were threatened with bodily harm. On the advice of Lloyd Cullison and George Lloyd of the Eldorado police department, she therefore left the area temporarily and went to Kentucky. Another reason she went to Kentucky was that her grandfather was sick. He subsequently died three or four weeks after she arrived. Respondent testified that she did not take the children with her on this trip because she had to travel to Kentucky by foot, a trek which lasted five days.

At the conclusion of respondent's testimony, several witnesses were recalled to offer rebuttal, and closing arguments were made by counsel. Thereafter, the court entered orders finding that the allegations in the supplemental petition that respondent had failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of Dorothy and Joseph Wright had been proved by clear and convincing evidence, that respondent was, therefore, unfit under section 1D of the Adoption Act (Ill. Rev. Stat. 1983, ch. 40, par. 1501D), and that it was in the best interest of Dorothy and Joseph that their guardian be granted authority to consent to their adoption. Accordingly, the court ordered that respondent's parental rights over Dorothy and Joseph be terminated and granted authority to the guardianship administrator of DCFS to consent to their adoption. This order was dated June 15, 1984, and filed June 18, 1984. Respondent now appeals.

■ Section 5—9 of the Juvenile Court Act (Ill. Rev. Stat. 1983, ch. 37, par. 705—9) provides that the parental rights of a nonconsenting parent can be terminated only upon an adjudication that the parent is "unfit" within the meaning of section 1 of the Adoption Act (Ill. Rev. Stat. 1983, ch. 40, par. 1501). A judgment that a parent is unfit to rear his or her own children is one of the most devastating of judicial decisions. (*In re Paul* (1984), 101 Ill. 2d 345, 461 N.E.2d 983.) Courts have recognized that cases of this nature are *sui generis*; each

must be decided in accordance with the facts of each individual and varying situation. (*In re Hurley* (1976), 44 Ill. App. 3d 260, 357 N.E.2d 815.) Accordingly, where the permanent severance of parental rights is at issue, the facts must be reviewed with careful scrutiny. *In re Woods* (1977), 54 Ill. App. 3d 729, 369 N.E.2d 1356.

▆▆ ▆ The termination of parental rights requires a finding of unfitness fully supported by clear and convincing evidence. (*In re Paul* (1984), 101 Ill. 2d 345, 461 N.E.2d 983; *In re Brown* (1981), 86 Ill. 2d 147, 427 N.E.2d 84; *In re T.E.* (1984), 128 Ill. App. 3d 449, 470 N.E.2d 1300; *Davis v. Bughdadi* (1983), 120 Ill. App. 3d 236, 458 N.E.2d 177.) Invoking that standard, a court will not reverse a finding of unfitness unless it is against the manifest weight of the evidence. The trial court's opportunity to view and evaluate the parties and their testimony is superior to that of the reviewing court. Accordingly, the trial court's finding should be given great deference. *In re Brown* (1981), 86 Ill. 2d 147, 427 N.E.2d 84; *In re Hollis* (1985), 135 Ill. App. 3d 585, 482 N.E.2d 230; *In re J.R.* (1985), 130 Ill. App. 3d 6, 473 N.E.2d 1009.

▆ As previously noted, DCFS' supplemental petitions in this case alleged that respondent was unfit for three reasons: (a) because she had abandoned the children, (b) because she had failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the children, and (c) because she had deserted the children for more than three months prior to the filing of the supplemental petitions. In finding respondent to be an unfit parent, however, the court's decision was based solely on the second of these grounds.

The trial court did not make any specific findings of fact, nor did it recite the evidence it thought supported its conclusion that respondent had not maintained a reasonable degree of interest, concern or responsibility for the welfare of Dorothy and Joseph. The court's decision was presumably based upon respondent's demonstrated indifference to her children and her complete disregard for their health and welfare for a year. Respondent and the children first came to the attention of DCFS when she abandoned them and went to Kentucky for a reason that did not come close to justifying the abandonment. She "gave" the children to her husband, their father, who was unable for reasons of health to care for them. At the time, the children were living in filthy, deplorable conditions and were themselves filthy and obviously without care, adequate or otherwise. When, and only when, other family members were unable to care for them, the DCFS assumed their care and placed them in foster homes.

The action of DCFS began with a low level of intrusion into the

family, seeking merely an order declaring the children to be wards of the court. The action was taken without notice to respondent, who had vanished, because it was necessary for the health of the children.

Following the initial hearing the DCFS exerted an effort that endured for a year to reunite the family. These efforts were unsuccessful and consisted, for the most part, in trying to locate respondent and encourage her to assume the role of a mother to her children. At an early meeting between Ms. Robinson of DCFS and respondent, her responsibilities were discussed, suggestions were made for her improvement, goals were set, and visitation with the children urged. Respondent's reaction was to appear in court with the children's father and agree to a finding that the children were dependent and neglected and that they be placed under the guardianship of the DCFS. Thereafter the respondent displayed almost no interest in the children and by her conduct seemed to be actively avoiding contact with the DCFS and her children. Although she testified that she had walked on one occasion from Carrier Mills to Harrisburg for a visit and that she had no transportation to make visits, other evidence made this testimony highly suspect. Her boyfriend, Terry Vailes, stated that he took her wherever she wanted to go and would have taken her to see her children any time she had wanted to go at his expense. He testified that he did take her to the DCFS office five times for visitation, but it was refused. This was apparently after the petition was filed by the DCFS to terminate parental rights. Further, at the meeting in November 1983 at which both respondent and the father were present, only the father requested a visit with the children. A visit for both respondent and the father was arranged for early December, but neither of them made it. The father was in jail, and respondent had gone to Kentucky with another man. Between September 1983 and March 1984 the respondent did not request any visitation with the children, did not call or write them, and did not send them birthday cards, Christmas cards or gifts.

The People introduced evidence to show that respondent had an older child living with her mother in Ohio and that respondent never sought to make any contact of any nature with or concerning this child.

Respondent attempts to place the blame for her failures upon the DCFS for not doing enough to implement the goals that had been set for her. But Ms. Robinson testified at length to the difficulty of locating respondent and getting her to put forth some effort in her own behalf. On one occasion, Ms. Robinson testified, respondent even refused to disclose her street address where she was living with

friends.

We believe the foregoing facts and evidence fully support the finding of the trial court that respondent was an unfit parent because she failed to maintain a reasonable degree of interest, concern or responsibility for her children. Admittedly, the conditions shown by the facts here are not as bad as those in *In re T.E.*, but they are worse than those of *In re Paul* and are sufficient to us to say that the decision of the trial court was not against the manifest weight of the evidence.

■ Respondent contends that her efforts, whether or not successful, are what must be considered in determining her fitness as a parent under section 1D(b) of the Adoption Act, citing *In re Hurley* (1976), 44 Ill. App. 3d 260, 357 N.E.2d 815. It is our assessment of the evidence, however, that even judged by this standard, the finding of the trial court was not against the manifest weight of the evidence and that respondent's unfitness was established by clear and convincing evidence.

Affirmed.

KASSERMAN, P.J., concurs.

JUSTICE HARRISON, dissenting:

The majority's claim that respondent demonstrated indifference to her children and complete disregard for their health and welfare for a year is based on a selective reading of the evidence and is inaccurate. With respect to the frequency of respondent's contacts with her children, the record shows that between May of 1983 and June of 1984, respondent visited both children on at least one occasion, in July of 1983, and saw her daughter, Dorothy, on another, in September, 1983. She and her husband arranged a visit with the children for December of 1983, but she was subsequently unable to attend because she had no transportation. In addition, beginning in March of 1984, respondent made repeated requests for visitation to her case worker, but was denied permission pursuant to DCFS policy prohibiting such visits when parental termination was sought. Respondent made these efforts at visitation although she owned no automobile and had to rely on others for transportation or travel to the DCFS office by foot.

Cases which have upheld trial court findings of unfitness have generally involved a more prolonged period of inattention. (See *e.g., People ex rel. Patterson v. Patterson* (1976), 36 Ill. App. 3d 484, 344 N.E.2d 226 (one visit in two years); *In re Ice* (1976), 35 Ill. App. 3d 783, 342 N.E.2d 460 (four years); *In re Grant* (1975), 29 Ill. App. 3d

731, 331 N.E.2d 219 (no visits in five years then one visit per year for three years); *In re Einbinder* (1975), 31 Ill. App. 3d 133, 344 N.E.2d 187 (nine years); *In re Perez* (1973), 14 Ill. App. 3d 1019, 304 N.E.2d 109 (five years).) Moreover, whatever inattention was exhibited by respondent here was not the product of mere indifference. The adjudicatory order making respondent's children wards of the court, entered in September of 1983, was silent on the issue of visitation. Subsequent to that order, respondent's case worker did not advise respondent that she retained the right of visitation, nor did the case worker make any attempt to encourage additional visits between respondent and her children. (*Cf. In re Overton* (1974), 21 Ill. App. 3d 1014, 1019, 316 N.E.2d 201, 205.) After March of 1984, the case worker went further and expressly prohibited such visits. Where, as here, DCFS itself obstructs parental contact, the failure of such contact to take place cannot serve as the basis for establishing lack of fitness. *In re Taylor* (1975), 30 Ill. App. 3d 906, 911, 334 N.E.2d 194, 197.

Respondent may not have attempted to contribute toward the support of her children while they were in State custody, but as in *Blakey v. Blakey* (1979), 72 Ill. App. 3d 946, 948, 391 N.E.2d 222, 224, she was never ordered or requested to do so. Nor did she have financial ability to do so, having been unemployed throughout the period at issue. DCFS also argues that respondent did not telephone her children or send them birthday or Christmas cards between September of 1983 and the time of the hearing on the supplemental petition. With respect to Dorothy, respondent's daughter, the failure to send a birthday card is hardly surprising, given that Dorothy's birthday was in August. As for Joseph, his birthday came at the end of February. Respondent did try to visit him and Dorothy shortly thereafter, in March, but was absolutely prohibited from doing so by DCFS. Although no Christmas cards or presents were sent, respondent and her husband had planned to visit the children personally in December. Respondent did not telephone the children because she had no phone of her own. On those infrequent occasions when she managed to gain access to a telephone, she used it to inquire about employment, which was apparently required by the State in order for her to continue to receive general assistance in order to support herself, and by DCFS as a precondition to regaining custody of her children.

DCFS contends that lack of fitness can be inferred from the fact that respondent has another child, not before the court, who does not live with her and with whom she no longer communicates. In support of this proposition, DCFS cites *In re Perez* (1973), 14 Ill. App. 3d. 1019, 304 N.E.2d 109. That case is not dispositive. Although the court

there considered that one of the mother's children did not reside with her in reaching its conclusion that she was an unfit parent, the circumstances surrounding that situation are not given and therefore cannot be directly compared to the case at hand. Here, the record showed that respondent's third child was born to her after her marriage to her husband but that her husband was not the father. Because respondent and her husband lacked the financial resources to rear the child, the child was thereafter sent to live with respondent's mother, who now refuses to allow respondent to have the child back. One may not approve of respondent's resolution of this family tragedy, but it is scarcely conclusive evidence that she is an unfit parent to her other children.

The majority asserts that DCFS "exerted an effort that endured for a year to reunite the family." It did not. While DCFS set "goals" for respondent and discussed them with her from time to time, it made no attempt to assist her in accomplishing them. This is pointedly illustrated by the following exchange between respondent's attorney and Ms. Robinson:

"Q. Did you yourself, as a case worker, do anything other talk [sic] with Barbara Wright—what I mean by that is, did you make any contacts or try to help her with her job, or do anything affirmatively other than just tell her what she should be doing?

A. No.

Q. Did you suggest prices [sic] where, with her abilities where she might get a job?

A. No.

Q. Did you tell her what type of house she should be looking for?

A. I said a safe, secure home, clean.

Q. Did you discuss with her the possibility if she didn't find a job what would happen?

A. No."

When, at another point, respondent's attorney asked Ms. Robinson whether DCFS had discussed with respondent the problems of how she could finance and maintain a house without a job, Ms. Robinson simply stated: "We suggested seeking employment."

With regard to the goal of attending parental classes, Ms. Robinson admitted that she never set up any appointments for respondent to attend these classes, although this was normally part of Robinson's job. Respondent testified that Ms. Robinson did tell her at an October, 1983, meeting that she could attend parenting classes in Eldorado,

but by this time she had moved from that town. Respondent advised Ms. Robinson that she could not go there, explaining, "*** I didn't have no way to get over there because Terry Vailes' car didn't have no gas most of the time and it was hard to walk over there because I've got two bad ankles." When asked whether DCFS made any other suggestions to her, respondent testified that it had not.

Ms. Robinson justified DCFS' failure to arrange appointments for respondent to attend parenting classes on the grounds that she had difficulty locating respondent. Ms. Robinson testified, however, that she did see respondent on September 21, 1983, prior to the adjudicatory hearing, and again on September 27, 1983, the day of that hearing. At this time respondent told Ms. Robinson that she was living with friends. Although respondent would not give Ms. Robinson her street address, Ms. Robinson did not inquire into the reason for her refusal, nor did she explain to respondent that DCFS needed the address to contact her. Ms. Robinson next saw respondent less than two months later, when respondent and her husband stopped by Robinson's office. According to Ms. Robinson, respondent volunteered the address at which she was then living. The only attempt DCFS made to contact respondent at this address consisted of a letter confirming a visit with the children that had previously been arranged.

In fact, the only time after the September adjudicatory hearing when Robinson said she was unable to contact respondent was in February and March of 1984, after the decision had been made to seek termination of respondent's parental rights. Robinson's attempts to locate respondent at this time were, by her admission, limited to two telephone calls, checking with someone in respondent's family, and checking at a hotel where respondent had once stayed.

While these attempts were unsuccessful, any uncertainty about respondent's whereabouts was short lived. According to Ms. Robinson, respondent visited her office on or about March 14, 1984. In April, Ms. Robinson visited respondent at her home, having previously been given the address by respondent. Respondent visited Ms. Robinson at her office again during the first week of May, 1984, and Ms. Robinson was able to recite respondent's current address at the time of the hearing on the supplemental petition.

Ms. Robinson testified that after respondent was notified of plans to terminate her parental rights in March of 1983, her interest in the children increased, and she requested visits with them. Visitation was denied by DCFS, however, pursuant to a policy of refusing to permit parental visitation after a petition had been filed to terminate parental rights. Finally, Robinson stated that she never told respondent

that compliance with DCFS "goals" was necessary in order for respondent to visit with her children. At the same time, however, Robinson did not deny that she never told respondent that failure to meet DCFS "goals" would result in respondent's parental rights being terminated.

Cases involving parental fitness have stressed that the intent of a parent is of paramount importance. (*In re Adoption of Mantzke* (1984), 121 Ill. App. 3d 1060, 1068, 460 N.E.2d 80, 85.) In the matter now before the court, respondent exhibited an unambiguous intention to regain custody of her children and preserve her role as their mother. This intention manifested itself through her attempts to secure employment and provide a suitable home in accordance with the "goals" established by her DCFS case worker. By the time of the hearing on the supplemental petitions, respondent remained unemployed, but had obtained a furnished home of her own with ample space to accommodate the children. There was no dispute that respondent was able to properly maintain this home, that her personal appearance had improved, and that she had otherwise begun to take more responsibility for her life. In addition, the evidence showed that when among friends, respondent spoke frequently of the children and expressed her love for them.

Uncontradicted testimony showed that when respondent first left the children in her husband's care and went to Kentucky, she did so in part out of fear of physical violence against herself and the children and was gone only a short time. When respondent returned, she communicated with the DCFS case worker at regular intervals, including June 1983, July 1983, September 1983 (twice), October and/or November 1983, and March, April and May of 1984. As previously noted, although the DCFS case worker did not always know respondent's whereabouts, she never advised respondent of a need to know where respondent lived so that she could contact her, nor did the case worker even make any attempt to reach respondent for any reason prior to February of 1984, with the exception of one occasion in the fall of 1983 when the case worker wanted to confirm by letter a previously arranged appointment for respondent to visit her children. Respondent appeared at all court hearings, but one, in June of 1983, for which no prior notice was apparently attempted by DCFS.

To be sure, the record contains many examples of respondent's shortcomings and failures. Nevertheless it is respondent's efforts to carry out her responsibilities, and not her successes, by which fitness is to be determined under section 1, paragraph D(b) of the Adoption Act (Ill. Rev. Stat. 1983, ch. 40, par. 1051D(b)). (*In re Hurley* (1976),

44 Ill. App. 3d 260, 267, 357 N.E.2d 815, 820.) Here, the efforts exerted by respondent are particularly significant given the virtually complete absence of guidance and assistance provided by her DCFS case worker. Compare, *e.g.*, *In re Hillyer* (1980), 82 Ill. App. 3d 505, 510, 403 N.E.2d 36, 40, where the court upheld a finding of unfitness because, *inter alia*, DCFS had made a "great effort," ultimately unavailing, to help the mother and tried to teach her the minimal housekeeping and parental skills necessary to maintain a safe and healthful environment for her children.

As the majority correctly observes, a judgment that a parent is unfit to rear his or her own children is one of the most devastating of judicial decisions. (*In re Paul* (1984), 101 Ill. 2d 345, 354-55, 461 N.E.2d 983, 987.) For the reasons set forth above, I cannot agree that the facts present here warrant imposition of so drastic a sanction. The majority cites *In re Brown* (1981), 86 Ill. 2d 147, 427 N.E.2d 84, *In re Hollis* (1985), 135 Ill. App. 3d 585, 482 N.E.2d 230, and *In re J.R.* (1985), 130 Ill. App. 3d 6, 473 N.E.2d 1009, for the proposition that great deference should be paid to the trial court's determination, but none of those cases is remotely analogous to the one now before us. *In re Hollis* involved repeated and serious incidents of physical abuse of a child by her sociopathic father in which the child's ribs were fractured and, on the last occasion, her lung collapsed. *In re Brown* dealt with the failure of respondent, over a protracted period of time, to take any steps to protect his child from an environment in which she was severely beaten and burned, and her three-year-old sister murdered. In *In re J.R.* respondent was found to be unfit because she allowed a man to reside in the household who had been convicted of battery of one of her children and, after being released from prison on that charge, murdered another; she failed to report the murder; and she both allowed the child's body to remain in the residence with her other children and lied to the police to conceal the location of the body.

The right of a parent to rear his or her child is fundamental. It is, as our supreme court has recognized, one of mankind's most important rights. (*In re Paul* (1984), 101 Ill. 2d 345, 355, 461 N.E.2d 983, 987.) The majority's finding that respondent has forfeited that right is without legal precedent. I would reverse.