369 N.E.2d 1356 (1977)
54 Ill. App.3d 729
12 Ill.Dec. 342
In the Interest of Deborah, Harrold, Jr., and Agnes WOODS, minors.
PEOPLE of the State of Illinois, Petitioner-Appellee,
v.
Harrold D. WOODS, Respondent-Appellant.
No. 76-749.
Appellate Court of Illinois, First District, Second Division.
November 15, 1977.
*1357 James J. Doherty, Public Defender of Cook County, Chicago, for respondent-appellant; Frances G. Sowa, Marc L. Fogelberg, Asst. Public Defenders, of counsel.
Bernard Carey, State's Atty. of Cook County, Chicago, for petitioner-appellee; Laurence J. Bolon, Myra J. Brown, Richard J. Barr, Jr., Asst. State's Attys., of counsel.
PUSATERI, Justice:
Respondent, Harrold D. Woods, appeals from an order declaring him an unfit parent and appointing a guardian to consent to the adoption of Deborah, Harrold, Jr. and Agnes Woods, respondent's children. Patricia Woods, the children's mother, also was declared an unfit parent in this cause by default and had not prosecuted an appeal. Respondent contends on this appeal that the evidence does not support the finding that he was an unfit parent under the provisions of the adoption act. Ill.Rev.Stat. 1973, ch. 4, par. 9.1-1 D(b).
In 1963 respondent's three children, then ages five, four and 2 respectively, were placed in the custody of the Department of Children and Family Services (hereafter "the Department") by dependency proceedings. The Department in turn placed the children in the foster care of Mr. and Mrs. Ernest Winters in March of 1964, where they have since remained. On June 25, 1975, the respondent filed a petition for relief in which he alleged that the foster parents had removed the children from the jurisdiction without prior court approval making him unable to visit with his children. Respondent also sought to have the guardianship status dissolved and the children returned to his custody. The Department subsequently petitioned the court on July 7, 1975, to appoint a guardian to consent to the children's adoption pursuant to section 5-9 of the Juvenile Court Act (Ill. Rev.Stat.1973, ch. 37, par. 705-9). Section 5-9(1)(3) of the Juvenile Court Act provides that the finding of parental unfitness must be made in compliance with the adoption act which in section 9.1-1 D(a) through (l) lists the grounds upon which a parent might be found unfit. The petition alleged under subsection (b) thereof that Harrold and Patricia Woods were unfit parents in that they failed to maintain a reasonable degree of interest, concern or responsibility as the the children's welfare.
*1358 At the hearing on the petitions, the children's foster mother, Annie Winters, testified that the respondent had visited the children on six occasions for a total of approximately seven and one-half hours during the 12 year period they resided in her home. She stated that the first two visits occurred in 1965, one in the spring and one again in July or August. These visits lasted approximately two hours each; during both times the respondent was accompanied by another man and in both instances appeared to be intoxicated.
Mrs. Winters further testified that as a result of the respondent's condition on these two occasions, she arranged for the third visit at the foster agency. This office visit occurred in November 1966 and lasted 30 minutes. The last three visits occurred at the Winters' home, one in the spring of 1967 when the respondent arrived with a woman and stayed approximately one hour; then at Christmas time in 1967, where respondent arrived at 11:00 p.m. with a woman and a young man unannounced, again staying for approximately one hour, and finally in June 1975, eight years later.
Mrs. Winters further testified that during the 12 year period that respondent's children were in her home the respondent only sent them birthday cards during the first two years; that they received no other cards, letters or phone calls from him, and that the only presents he gave them were gifts of $75 to $85 worth of clothing in the spring of 1967, and that he gave each child $7 during his visit in June of 1975. Mrs. Winters also testified that the children never requested a meeting with their father, but that they had asked about him, that she never discouraged the respondent from seeing his children, and that she was always receptive to his visits. Mrs. Winters also testified that she had met the children's mother, Patricia Woods, on two occasions, the last being nine years prior to trial; that at the last meeting Mrs. Woods bought a bicycle for Harrold, Jr. but had not wanted to see any of the children.
Deborah Woods, the eldest child of respondent, age 17 at the time of trial, testified that she had lived with the Winters family since she was five and that she had seen the respondent three times during her stay. She stated that eight years had elapsed between the respondent's second and third visits, and that during this period the respondent had not sent her any letters, made any phone calls to her or given her any gifts. Deborah did remember receiving birthday cards from the respondent when she was smaller and stated that she received $7 from him during his last visit in June of 1975. On cross-examination Deborah testified that she understood that being adopted meant the termination of her father's rights, "that he wouldn't rule over us again," and stated that she didn't want to live with her father because "he can't support us" and also since the respondent hadn't shown any interest in her welfare in the past nine years.
Harrold Woods, Jr., who was almost 16 at the time of trial, testified that he had lived with the Winters family for 12 years; that prior to the respondent's last visit in June of 1975 respondent had not visited for eight years; that during this eight year interval the respondent had sent him one Christmas card but hadn't made any calls nor given him any gifts with the exception of the $7 he received during the respondent's last visit. Harrold also testified that he had no feelings about going back and living with his father, that he would like to visit him on occasion and that he did not want to be adopted. Harrold further stated that his sisters wanted to be adopted since "they don't want nothing like this to happen again." He testified that he wanted the respondent's rights to be terminated, desired to continue living with the Winters and when asked whether he would like to continue the relationship of father and son with respondent responded "No."
Agnes Woods, the youngest child, age 14 and a half at the time of trial, testified that she could not remember when she saw the respondent prior to his visit in June of 1967; that she remembered receiving a card and a watch from the respondent when she was "little," and had received $7 from him at the time of his last visit.
*1359 The first witness for the respondent, Harrold Dawson, an administrative assistant from Northwestern University Medical School, brought the clinical records pertaining to Harrold Woods to the hearing. On the basis of these records, the parties stipulated that the respondent was suffering from a heart condition and was treated at Northwestern University Clinic for this problem intermittently between August 1967 and December 27, 1974. The clinic's records disclosed that respondent was treated twice in 1967, no times in 1968, twice in 1969, twice in 1970, four times in 1971, three times in 1972, three times in 1973 and six times in 1974.
The respondent, Harrold Woods, testified that he saw the children two or three times in 1963 before they were placed in the Winters' home. He also testified that his heart condition impeded his visitation between 1965 and 1974; that he had a heart attack after his first three visits in February 1965 and had to remain in Cook County Hospital for 20 days and had a second heart attack in June of 1965 and was hospitalized for four months. He further testified that he would have visited the children more but for foster agency's discouragement; he urged the social worker to arrange visits between 1964 and 1966 but to no avail, and had not learned of the Winters' address until a social worker finally informed him of it in 1966. On his visit in the spring of 1964, respondent had to take a bus to the Winters' home, necessitating a four or five mile walk, taking two hours in both directions. The respondent was not supposed to be engaging in strenuous activity at this time, nor was he to go out in the cold weather.
Respondent made three other visits to the Winters' home during the warm months of 1966 accompanied by an unnamed friend. Woods further testified that he received a visit from a Department social worker in 1966 who told him not to visit the children too frequently because he would upset their program by his visits and make it hard for them to readjust. As a result, he cut his visits to two in 1967, one in 1968, one in 1969; he also stated that he attempted to visit the children at the Winters' home once in 1972 and once in 1973 but found no one home. He stated that the Department never offered him assistance in devising a plan to help him regain custody of his children, but only frustrated his expectations by informing him that he would have to remarry or have a woman in his home before they would be returned to him.
Woods further testified that during the period of 1970-1972 he sent the children birthday cards, Christmas cards and a letter but that he never received any response. He was informed by his children at the time of his June 1975 visit that they never received any of his correspondence; however, none of these items were ever returned to the respondent. Respondent further testified that he had called the children on several occasions, and on one occasion Agnes answered the phone; that he gave the children gifts of money on all of his visits, $5 per child on his first visit in 1966, $10 per child on his second visit in 1966, $10 per child on his first visit in 1967, $30 per child on his second visit in 1967, $20 per child in 1968 and $7 per child in 1975. Respondent also introduced evidence indicating that he was receiving money from the Veterans Administration and Social Security Administration as a result of his disability which were to be held for the children; he also had two insurance policies with the children as beneficiaries.
On cross-examination, when asked why he had not contacted the children for a five year period, respondent stated that he was going to school during the latter part of 1970 and 1971 and that he had made phone calls to the Winters' home during this time; that for the next three years he was in ill health and was advised by his doctor to "take it easy," and further that he talked to Mrs. Winters on three or four occasions during this time.
We note at the outset that the purpose and policy behind the Juvenile Court Act and adoption act is "* * * to preserve and strengthen the minor's family ties whenever possible * * *" and further, *1360 that the statute "* * * shall be administered in a spirit of humane concern. * * *" (Ill.Rev.Stat.1973, ch. 37, par. 701-2.) As a result, various principles have evolved in Illinois implementing this statutory enactment. It is well recognized that the natural parent has superior rights to the custody of his child as against others. (McAdams v. McAdams (4th Dist. 1964), 46 Ill.App.2d 294, 298, 197 N.E.2d 93; In re Hrusosky (3rd Dist. 1976), 39 Ill.App.3d 954, 957, 351 N.E.2d 386.) This inherent right therefore should not be abrogated absent compelling reasons. (In re Grant (1st Dist. 1975), 29 Ill.App.3d 731, 735, 331 N.E.2d 219.) One of these reasons is parental "unfitness" demonstrated by a parent's "failure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare." (Ill.Rev.Stat.1973, ch. 4, par. 9.1-1(D)(b).) The State must meet this burden by clear and convincing evidence. (Rich v. Rich (1st Dist. 1977), 51 Ill.App.3d 174, 9 Ill.Dec. 318, 366 N.E.2d 575.) It has also been recognized that cases of this nature are sui generis, each must be decided in accordance with the particular facts of each individual and varying situation. (In re Hurley (2nd Dist. 1976), 44 Ill.App.3d 260, 266, 2 Ill.Dec. 595, 357 N.E.2d 815.) Hence, in matters involving children and particularly in instances such as the one before us dealing with the permanent severance of parental rights, the facts must be reviewed with careful scrutiny.
The respondent's sole contention is that his failure to communicate and visit with his children did not demonstrate his unfitness, since certain mitigating circumstances justified his actions; his ill health, poverty and lack of transportation coupled with the Department's discouraging advice impeded him from developing a close relationship with his children.
The evidence disclosed that the respondent visited his children six times with a total duration of approximately seven and one-half hours during the almost 12 year period they resided in their foster home. Respondent admitted not having any contact whatsoever with his children from 1964, the date they were placed in their foster home, until the spring of 1966. He testified that during this time he suffered two heart attacks which confined him to a hospital and rest home in 1965 and also claims that he was unaware of the children's location. When the respondent learned of his children's residence in 1966, he visited them three times that year, once allegedly alone causing him to walk four or five miles to the foster home and two other times accompanied by "strangers" who provided him with transportation. Respondent claims that his visits were curtailed due to the advice he received from the Department informing him not to visit too frequently since it made it more difficult for his children to readjust. As a result he claims to have visited his children twice in 1967, once in 1968, once in 1969 and then once in 1972 or 1973 but found no one home. He further claims to have brought the children gifts of money at each visit. Mrs. Winters, however, refuted his testimony by stating that he did not visit at all between 1965 and 1975. Respondent also attributes the sparse number of his visits to his unsuccessful attempt at running a business between 1969 and 1971 and going to school and poor health during the period of 1972-1975.
The evidence also indicates that the respondent sent his children birthday cards during the first two years they were in their foster home; thereafter at the most, respondent sent the children Christmas cards and birthday cards during 1970-1972 and called the Winters' home on several occasions, and at the least as testified to by respondent's children and Mrs. Winters, never sent any cards, letters, made no phone calls and demonstrated little if any interest in the children for a period of eight years.
Respondent cites several cases for the proposition that his illness, poverty and lack of transportation excuse his infrequent visitation and do not clearly and convincingly establish that he was an unfit parent. However, we find these cases to be factually dissimilar to the case at bar. The leitmotif in these cases emphasizes that it is *1361 "* * * efforts to carry out [one's] parental responsibilities rather than their success, which should be considered in determining the correctness of a finding of unfitness under subsection D(b). * * *" (In re Taylor (1st Dist. 1975), 30 Ill.App.3d 906, 909, 334 N.E.2d 194, 196.) Hence, in In the Interest of Gibson (2nd Dist. 1975), 24 Ill. App.3d 981, 322 N.E.2d 223, the respondent while intellectually and financially limited, visited her child seven times between 1968 and 1972, increased her visits after the petition was filed and had written her child often during the period of separation. In In the Interest of Deerwester (4th Dist. 1971), 131 Ill.App.2d 952, 267 N.E.2d 505, the court emphasized that the number of times the respondent attempted to arrange contacts was most important noting that the respondent was diligent in her inquiries and attempts to arrange visits; that she sent cards to her child who lived 80 miles away and the caseworker admitted that although the Department sometimes failed to return the respondent's calls, the respondent always attended promptly appointments that were arranged. Likewise in In the Interest of Overton (2nd Dist. 1974), 21 Ill.App.3d 1014, 316 N.E.2d 201, respondent visited her child three times within a year prior to her moving to Missouri but always wrote numerous letters to the caseworker explaining what she was doing and expressing concern for her child; and in In re Massey (4th Dist. 1976), 35 Ill.App.3d 518, 341 N.E.2d 405, respondent visited her children six times during the first three years and 18 times during the last three years of foster separation. Moreover, other cases, not cited by the respondent which reversed findings of unfitness, also stressed that the respondent's efforts were to be the measure of a parent's concern, interest or responsibility. See Peyla v. Martin (5th Dist. 1976), 40 Ill.App.3d 373, 352 N.E.2d 407 (where defendant-respondent while in the penitentiary attempted to set up two visits with his child while he was on a furlough), In re Hurley (2nd Dist. 1976), 44 Ill.App.3d 260, 267, 2 Ill.Dec. 595, 357 N.E.2d 815 (where visits by the respondent were arranged three to four times a month and respondent conversed with the caseworker at least once a week, although respondent could not always attend the meetings due to lack of transportation).
Unlike the aforementioned cases, the respondent in the case at bar failed to adequately communicate with his children or the department. We believe that the statement of the court in In re Hrusosky (3rd Dist. 1976), 39 Ill.App.3d 954 at page 957, 351 N.E.2d 386 at page 388, is applicable to the facts in the case at bar:
"In other cases where the appellate court reversed the trial court['s] order terminating parental rights, the time of separation between the parent and the child was often much less than in the case before us. There were problems such as long distances between parent and child and a corresponding lack of transportation for the parent. The evidence showed in those cases an attitude of blocking visitation attempts on the part of the Department and there was usually a showing of many attempts at visitation by the parent, or at least constant inquiry by the parent as to the child's health and situation, and the regular sending of letters and presents to the child." [Citations.]
We further note that our court has previously held that lack of transportation and poverty does not excuse a parent's lack of concern or interest for his child. See In re Ladewig (1st Dist. 1975), 34 Ill.App.3d 393, 340 N.E.2d 150, where the court found that lack of transportation did not excuse the respondent's infrequent visits, or failure to call or write her child for over a six year period; in In re Perez (1st Dist. 1973), 14 Ill.App.3d 1019, 304 N.E.2d 109 (where respondent's lack of concern was demonstrated by her lack of phone calls, letters and only visiting her child four times in a five year period); In re Grant (1st Dist. 1975), 29 Ill.App.3d 731, 331 N.E.2d 219 (where lack of transportation and poverty did not excuse respondent's visiting her children four times in eight years and occasionally sending gifts and making phone calls).
*1362 While the respondent in the case at bar claims that the Department dissuaded him from visiting his children, the evidence discloses that the Department merely suggested that he not visit too frequently. In addition, the respondent admits that Mrs. Winters did in fact set up one visit at the Department and further that he initially received the Winters' address from the Department.
We are cognizant of the type of conduct on the part of the Department that has at times made it the subject of considerable controversy. Moreover, we are unconvinced that we should be critical of the Department's conduct in this instance. The facts in In re Taylor stand in sharp contrast to the facts in the case at bar. In that case, a social worker testified that the respondent constantly attempted to contact her children but received only negative responses from the department. In fact, the social worker admitted that it was only because he had denied respondent the opportunity that she was unable to contact her children. In addition, the guardian ad litem urged the court to render some finding other than adoption. The court in reversing the finding stated 30 Ill.App. at page 911, 334 N.E.2d at page 197. "* * * that, where official acts prevent a parent from maintaining contact with a child, unfitness under the Adoption Act cannot be proven by such lack of contact standing alone."
The case at bar also is distinguishable from the above situation in that the respondent's lack of visitation was not his only flaw. His failure to contact his children by phone or letter, lack of diligent inquiry regarding their affairs and failure to send them gifts for a period of eight years is reprehensible.[1] It cannot be said in this instance that the Department nurtured the foster parent/child relationship; it was respondent's lack of interest and concern for them that made them want to remain with their foster parents.
It is not the function of this court to substitute its judgment for that of the trial court. (In re Hurley (2d Dist. 1976), 44 Ill.App.3d 260, 268, 2 Ill.Dec. 595, 357 N.E.2d 815.) The trial court's finding with respect to the termination of parental rights should not be disturbed unless it is contrary to the manifest weight of the evidence. (In the Interest of Jones (1st Dist. 1975), 34 Ill.App.3d 603, 340 N.E.2d 269.) Under the circumstances, we believe that the evidence in the case at bar unequivocally satisfied the clear and convincing standard.
Having reviewed the finding that respondent was an unfit parent, it is now proper for us to consider the best interests of the children prior to affirming the termination of a natural parent's rights. This is in accordance with the traditional theory that minors are wards of the court and is also prescribed by the Juvenile Court Act. (Ill.Rev.Stat.1973, ch. 37, par. 701-2(3)(c); also ch. 4, par. 9.1-20a.) In addition, while reaching an opposite result, we find the language in In re Massey, 35 Ill.App.3d at page 522, 341 N.E.2d at page 408, to be particularly suited to the case at bar:
"* * * [A] child is required to be placed in foster care early in its life and remains there for several years. The child receives loving care from the foster parents, grows to love them and relate to them as its real parents. Often, as here, the child needs special attention which the foster parents are especially suited to provide and the real parents at least partly through misfortune are not able to *1363 provide. Returning the child to its natural parents would be traumatic to the child. Under these circumstances, the best interests of the child would clearly be served by permitting it to be adopted. * * *"
All three of the respondent's children expressed their desire to remain with their foster parents. Both Deborah and Agnes indicated that they wanted to be adopted. While Harrold, Jr. did not want to be adopted, he too desired the respondent's parental rights to be terminated. Since the trial court's finding only empowered the guardian to consent to the children's adoption, Harrold's right to choose against being adopted has not been violated. Accordingly, we affirm the trial court's order declaring respondent to be an unfit parent and appointing a guardian to consent to the adoption of Deborah, Harrold, Jr. and Agnes Woods.
Affirmed.
DOWNING, P. J., and STAMOS, J., concur.
NOTES
[1] While not applicable to the case at bar, we take judicial notice of Public Act 80-558 (effective October 1, 1977) amending the statutory provisions set forth in Section 1 of the Adoption Act (Ill.Rev.Stat. 1975, ch. 4, par. 9.1-1) which imposes reciprocal duties on parent and Department and wherein it states in pertinent part as one of the grounds for parental unfitness that "failure, for a period of 12 months, to maintain reasonable contact with the child or to plan for the child's future, when the child is in the care of an authorized agency, whether or not the child is a ward of the court, provided the agency attempted to encourage and strengthen the parental relationship. Contact or communication by a parent with his or her child which does not demonstrate affection and concern does not constitute reasonable contact and planning."