*In re* JASON U. *et al.*, Minors (The People of the State of Illinois, Plaintiff-Appellee, v. Ronald McIntosh, Defendant-Appellant).

First District (6th Division)   No. 1—89—1243

Opinion filed May 17, 1991.

George A. Domas, of Chicago, for appellant.

John O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Susan S. Wigoda, and Gael O'Brien, Assistant State's Attorneys, of counsel), for the People.

Patrick T. Murphy, Public Guardian, of Chicago (Michael G. Dsida, of counsel), guardian *ad litem*.

JUSTICE EGAN delivered the opinion of the court:

The defendant, Ronald McIntosh, appeals from the order terminating his parental rights and appointing a guardian for his two sons, Jason and Michael, with the right to consent to their adoption. (Jason and Michael do not have the defendant's surname.) He contends that the judge misapplied the Adoption Act (Ill. Rev. Stat. 1987, ch. 40, par. 1501(D)(m)) and that part of the order was against the manifest weight of the evidence.

On June 25, 1985, the Illinois Department of Children and Family Services (DCFS) took protective custody of 18-month-old Jason and his six-month-old brother, Michael. DCFS removed Jason and Michael and their three older half-sisters from the home of their mother, Mary Jane, and the defendant, after their half-sister Jenni-

fer told the police that she had been sexually abused by her mother's "live-in boyfriend" and after their mother was arrested and charged with disorderly conduct and intoxication while in a car with her five children. The "live-in boyfriend" was not identified any further. Russell Jones, Mary Jane's former husband, is the father of the three girls.

Shortly after obtaining custody of the children, DCFS placed Jason and Michael in a foster home where they remained for the next four years, while the juvenile court proceeded with the disposition of their cases.

On April 22, 1986, the court held that Jason and Michael had been neglected and abused. On July 30, 1986, the court adjudicated Jason and Michael wards of the court and placed them under DCFS guardianship. On May 27, 1988, DCFS filed supplemental petitions seeking the termination of parental rights and the appointment of a guardian with the right to consent to Jason's and Michael's adoption.

Mary Jane had been involved in service plans with DCFS since 1982. She had also been receiving counseling from De Paul Mental Health Center and Children's Home and Aid Society since 1984. She and the defendant were never married. They lived together with the five children at 2813 Leavitt in Chicago for approximately one year. During this time the defendant actively assisted in the care of the children, and he treated all five children as if they were his own. The defendant and Mary Jane ceased living together in July or August of 1985, one or two months after they lost custody of the children. The defendant then moved in with a friend at 643 North Melrose.

Before the children were placed in foster homes, four of them were temporarily placed with Mary Jane's sister. The youngest child, Michael, was temporarily placed elsewhere. The defendant regularly visited the four children at Mary Jane's sister's home for approximately one month before they were placed in foster homes. Subsequently, the defendant did not see his sons again until January of 1988, after they had been in placement for 2½ years. Mignon Pruitt, a DCFS case worker, testified that, to her knowledge, the defendant did not telephone the children or send them any cards or letters during this 2½-year period.

The defendant was aware of the court proceedings involving the children. He testified that he discussed the matter with Mary Jane, and they decided that Mary Jane would be able to regain custody of the children sooner if the defendant would "stay out of the pic-

ture." He continued to see Mary Jane on a regular basis after the children were removed, and she informed him about her visits with the children and how they were doing, as well as the progress of the court cases. He frequently provided either transportation or bus fare to Mary Jane so that she could visit the children at local Children's Home and Aid Society offices. He also provided Mary Jane with money and "little things" to take to the children.

He continued to see Mary Jane throughout 1986 and into 1987, and she continued to provide him with information regarding the return of the children to her. Before May of 1987, the issue of returning the children to Mary Jane was directly related to her finding suitable housing. She received an eviction notice in the fall of 1986, and she did not know when she would be able to find a new place to live.

Pruitt testified that she had not tried to contact the defendant during the course of Mary Jane's first six-month service plan. After the children were removed from the home, Mary Jane told DCFS that she did not know where Russell Jones or the defendant could be found. Pruitt said that the defendant called her sometime between January and July of 1986 and expressed interest in seeing his sons. She set up an appointment for the defendant to visit the children, but he later called and cancelled the appointment. The defendant denied making any calls to Pruitt between January of 1986 and June of 1987.

In May of 1987, Mary Jane left the State of Illinois and went to Georgia. She did not tell any of the agencies involved that she was leaving. Sometime after her arrival in Georgia, she remarried, and during the course of the termination hearing, she used her new married name.

In January of 1988, the defendant telephoned the DCFS to schedule a meeting with Pruitt, who had been involved with the children since March of 1986. The defendant met with Pruitt and indicated that he wished to obtain custody of his two sons. He explained to Pruitt his reasons for not contacting her earlier.

Pruitt set up a three-month service plan for the defendant which included an "alcohol assessment," parenting classes, Alcoholics Anonymous meetings, and weekly visits with his sons. The goal of the plan was to return the two children to the custody of the defendant. He complied with the visitation aspect of his service plan. The defendant made his weekly visits, and although he was very guarded in the way he structured and managed the boys, he was "appropriate" with his sons during the course of those visits.

The defendant went for his alcohol assessment, but he failed to attend Alcoholics Anonymous meetings as required by his service plan. Pruitt provided him with the names of three parenting skills programs, but the defendant was unwilling to attend any parenting classes. Pruitt explained that the classes were deemed important because of the length of time during which the defendant had been absent from the boys' lives. The defendant testified that the classes interfered with his job, and he felt that he could establish a relationship with his sons on his own.

Pruitt visited the defendant's home at some time during the service plan, and she found it unsuitable for both him and his two sons. She explained that he was sharing an apartment with two other adults, and his room was not large enough for him and the two children. Pruitt indicated that she had assumed that all of the rooms in the apartment were occupied, because they all contained furniture.

Because the defendant was unable to sufficiently comply with the service plan, Pruitt indicated that she could not grant him unsupervised visits with his sons. She set up a second service plan, and she advised him that because the case had been in care for a number of years, the case was going to adoption screening. She explained to the defendant that he was only allowed a three-month plan, rather than a six-month plan, because the case had already been pending for so long, and she told him that he needed to cooperate with the service plan as quickly as possible. The defendant again failed to attend alcohol counseling and parenting classes as required by his second service plan. He testified that Pruitt did not tell him that, if he did not succeed in the service plan, she was going to have his sons permanently taken from his custody.

The judge made a general finding of unfitness on the part of the defendant. The judge specifically found that the defendant had failed to make reasonable efforts to correct the conditions which were the basis for the removal of the children from their home, failed to make reasonable progress toward the return of the children, and failed to maintain a reasonable degree of interest, concern or responsibility for the children's welfare. The judge then terminated the defendant's parental rights and appointed the DCFS guardianship administrator of Jason and Michael with the right to consent to their adoption.

■■ ■ The Illinois Supreme Court has recognized that parental rights are of deep human importance and must not be lightly terminated, and that a finding of parental fitness must be supported by

clear and convincing evidence. (*In re Paul* (1984), 101 Ill. 2d 345, 351-52, 461 N.E.2d 983.) However, a court may terminate parental rights and appoint a guardian with the power to consent to adoption if the court finds, based on clear and convincing evidence, that the parent is unfit. The decision to terminate parental rights and appoint a guardian rests within the sound discretion of the trial judge, and a reviewing court should not interfere with the trial judge's decision absent an abuse of discretion. *In re Allen* (1988), 172 Ill. App. 3d 950, 527 N.E.2d 647.

■ The applicable statute (Ill. Rev. Stat. 1987, ch. 40, pars. 1501(D)(b), (m)) provides as follows:

> " 'Unfit person' means any person whom the court shall find to be unfit to have a child, without regard to the likelihood that the child will be placed for adoption, the grounds of such unfitness being any one or more of the following:
>
> \*\*\*
>
> (b) failure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare;
>
> \* \* \*
>
> (m) failure by a parent to make reasonable efforts to correct the conditions which were the basis for the removal of the child from such parent, or to make reasonable progress toward the return of the child to such parent within 12 months after an adjudication of neglected minor under \*\*\* the Juvenile Court Act."

■ The defendant first argues that the trial judge erred in applying the "reasonable efforts" language of section 1(D)(m) of the Adoption Act in determining whether his parental rights should be terminated. (Ill. Rev. Stat. 1987, ch. 40, par. 1501(D)(m).) The defendant emphasizes that he did not have custody of the children at any time subsequent to the removal of the children from their home. He asserts that, according to *In re Loitra* (1979), 81 Ill. App. 3d 962, 401 N.E.2d 971, the "reasonable efforts" language of section 1(D)(m) does not apply to a noncustodial parent.

In *Loitra* the mother lost custody of her son because he had been abused. The trial court found the mother unfit under section 1(D)(m) of the Adoption Act for failing to make reasonable efforts to correct the conditions which were the basis for the removal of the child. (81 Ill. App. 3d at 964.) The appellate court reversed, noting that the "reasonable efforts" language of section 1(D)(m) did not apply in that case, because whether the mother adequately protected the child from abuse could not be determined if she did not

have custody of the child. (81 Ill. App. 3d at 965.) The court did not hold, as the defendant contends, that the "reasonable efforts" language can never be applied to a noncustodial parent. *Loitra*, therefore, is limited to its facts.

Moreover, eight years after *Loitra*, the Fourth District Illinois Appellate Court expressly held that section 1(D)(m) applies to noncustodial parents. (*In re J.R.Y.* (1987), 157 Ill. App. 3d 396, 510 N.E.2d 541.) The court stated as follows:

> "We find no cases specifically applying section 1(D)(m) of the Adoption Act to a noncustodial parent, but this absence of authority does not prohibit the use of common sense in giving this subsection a broad interpretation. A noncustodial parent, who has been made part of a neglect proceeding resulting in an order placing custody with a State agency, should not be free from the requirement of taking the responsibility for correcting the neglect conditions. To say that the custodial parent's rights could be terminated for failure to make reasonable efforts to correct the conditions, or to make reasonable progress toward the return of the child, while the noncustodial parent could avoid termination simply because he does not have, nor has ever had, custody escapes logic. Such a holding could result in a child being faced with foster care until majority, and being deprived of the chance for the benefits of an adoptive home. In a case such as this one, such a result is clearly against the best interests of the minor. *If there has been any doubt in the past, we now hold the parental rights of a noncustodial parent can be terminated under the provisions of section 1(D)(m) of the Adoption Act* [citation]. *** [The parent] is required to step in during a guardianship administered by the Department of Children and Family Services and correct conditions of neglect and make reasonable efforts to help the minor return to the custody of one of the natural parents. A noncustodial parent is charged with as much responsibility as a custodial parent for the support, protection, and care of a child. [Citations.] 'When a father loses custody of his children ***, he does not also lose all parental obligations.' [Citation.]" (Emphasis added.) 157 Ill. App. 3d at 399.

In this case, as in *J.R.Y.*, the dispositional order was effective as to both the mother and father of the children. The defendant, therefore, was required by section 1(D)(m) of the Adoption Act to

make reasonable efforts to correct the conditions which led to the removal of the children from their home.

■ We note that the defendant does not argue that the judge's finding that he did not make reasonable efforts to correct the conditions which were the basis for the children's removal was against the manifest weight of the evidence. Lest there be any doubt in the matter, we hold that the finding was supported by the evidence.

The defendant, however, does maintain that the judge's finding that he failed to maintain a reasonable degree of interest, concern or responsibility for his sons was against the manifest weight of the evidence.

The defendant had no contact with either of his sons for approximately 2½ years after they were removed from their home. The defendant testified that during that time he regularly provided transportation for Mary Jane so that she could visit the children. The trial judge, however, said that he was disturbed by the defendant's failure to go in and visit his sons on any of the occasions when he drove Mary Jane. The trial judge stated:

> "I also listened to the testimony of [the defendant] very closely. And I reviewed that testimony in my chambers. It disturbs me that during all of the numerous times that he testified to having taken [Mary Jane] to the agency's office to visit with the children that not one time did he go inside to see those children, his sons. That disturbs me. It doesn't make sense to me."

The defendant emphasizes his regular visits with his sons during the course of his service plans, beginning in January 1988. However, it is the defendant's conduct during the entire post-adjudication period that is relevant, not merely his conduct during his service plan. (*In re R.S.* (1988), 174 Ill. App. 3d 132, 528 N.E.2d 25.) Examination of the defendant's conduct during the entire post-adjudication period reveals that he failed to contact his sons in any way for approximately 2½ years. It has been held that failure to visit a child is not proof of unfitness if the parent offers a reasonable explanation. (*In re Martin* (1977), 48 Ill. App. 3d 341, 363 N.E.2d 29.) However, the defendant's explanation for his failure to visit Jason and Michael was that he thought it would help Mary Jane to regain custody of the children sooner if he stayed out of the picture. Contrary to the defendant's argument, the judge was not bound, as a matter of law, to accept that explanation as a legally sufficient reason for the defendant's failure to visit his sons. Moreover, that explanation does not excuse his failure to visit his

children or to contact them by phone, letter or any other means for 2½ years.

■ The defendant argues that, according to *In re Taylor* (1975), 30 Ill. App. 3d 906, 334 N.E.2d 194, it is his efforts to contact his children, rather than his success, that should be considered by this court. However, *Taylor* involved wrongful interference by a DCFS worker who prevented the parent from visiting the child. Similarly, interference by other third parties has been held to be a reasonable excuse for failure to visit a child. (*Davis v. Bughdadi* (1983), 120 Ill. App. 3d 236, 458 N.E.2d 177 (custodial parent hindered visitation rights of noncustodial parent); *Bryant v. Lenza* (1980), 90 Ill. App. 3d 275, 412 N.E.2d 1154 (foster parents prevented incarcerated father from contacting his children).) The defendant does not allege any wrongful conduct by a third party which prevented him from contacting his sons. Moreover, the record does not indicate that the defendant made any efforts to contact the children. Rather, the defendant admitted that he willfully decided not to contact them. We judge that the finding that the defendant failed to maintain a reasonable degree of interest, concern or responsibility for his sons is not against the manifest weight of the evidence.

■ Last, the defendant maintains that Pruitt "actively engaged in an insideous [*sic*] form of deception upon Mr. McIntosh in engineering his alleged failure." The defendant states that Pruitt never informed him that if he did not comply with the service plan, his parental rights would be terminated. (See *In re Drescher* (1980), 91 Ill. App. 3d 658, 415 N.E.2d 636; *In re Bales* (1980), 83 Ill. App. 3d 348, 403 N.E.2d 1344; *In re Barber* (1977), 55 Ill. App. 3d 587, 371 N.E.2d 299.) The remarks of the defendant directed toward Pruitt are unfortunate and unjustified. Even assuming that Pruitt's failure to tell the defendant of the possibility of termination of his parental rights might excuse his failure to attend Alcoholics Anonymous meetings or parenting classes, they do not excuse his failure to maintain a reasonable degree of interest, concern or responsibility during the 2½ years following the removal of the children from the home.

For these reasons, the judgment of the circuit court is affirmed.

Judgment affirmed.

McNAMARA and LaPORTA, JJ., concur.