643 N.E.2d 1315 (1994)
268 Ill. App.3d 239
205 Ill.Dec. 708
In re T.D., I.D., and L.B., Jr. (The People of the State of Illinois, Petitioner-Appellee, v. Lester Baldwin, Sr., Respondent-Appellant.)
No. 1-94-0006.
Appellate Court of Illinois, First District, Second Division.
November 22, 1994.
*1316 Rita A. Fry, Public Defender of Cook County, Chicago (Cary M. Berman, Asst. Public Defender, of counsel), for appellant.
Jack O'Malley, State's Atty. of Cook County, Chicago (Renee Goldfarb, Susan S. Wigoda, Gunta Z. Hadac, Asst. State's Attys., of counsel), for appellee.
Justice SCARIANO delivered the opinion of the court:
Respondent Lester Baldwin, Sr. appeals from the trial court's finding that he is an unfit person based on his failure to maintain a reasonable degree of interest, concern or responsibility regarding the welfare of his three children. See 750 ILCS 50/1(D)(b) (West 1993). He maintains that the trial court's finding was against the manifest weight of the evidence.
Two of respondent's children, T.D. (Trissie) and L.B., Jr. (Lester), were born in 1987. Trissie was born at home on December 24, 1987, weighing one pound, 11 ounces. Shortly after the birth, her mother, Irma Durdin, went to the hospital where it was discovered that she was still pregnant, but she refused to remain hospitalized. However, she returned on January 3, 1988, and gave birth to Trissie's twin, Lester, on January 6, 1988. Lester weighed two pounds, eight ounces, and had traces of PCP and cocaine in his system. The babies remained hospitalized until April 1988.
The Department of Children and Family Services (DCFS) subsequently petitioned for adjudication of wardship and was awarded temporary custody of the twins. DCFS entered the case because the drugs found in Lester's system indicated that his mother had used drugs in violation of an order of protection issued in regard to her two older children.[1] (See 705 ILCS 405/2-3(1)(c) (defining a neglected minor as "any newborn infant whose blood or urine contains any amount of a controlled substance * * * or a metabolite of such substances * * *.") DCFS did not allege that respondent was neglectful.
In December 1991, DCFS petitioned for appointment of a guardian with the right to consent to adoption for the twins and I.D. (Irma), their sister, who had been born in 1989. Before the children could be placed for adoption without their parents' consent, a court would have to find respondent and Durdin unfit by clear and convincing evidence. (750 ILCS 50/8(a)(1) (West 1993).) DCFS alleged that respondent was unfit because he had failed to show a reasonable amount of interest, concern or responsibility regarding the welfare of his three children. 750 ILCS 50/1(D)(b) (West 1993).
At the fitness hearing,[2] Wendy Nussbaum of the Ray Graham Agency (the Agency) testified that when Trissie and Lester were released from the hospital, DCFS placed them with the Agency, which in turn placed them with their foster mother with whom they still reside. Between April 1988, when the children were placed with the Agency, and April 1992, respondent did not contact the Agency to arrange for visitation. The Agency is not responsible for arranging visits *1317 with parents and thus made no attempt to reach respondent.
Addo Carpenter, a DCFS social worker, testified that he was initially in charge of the case involving respondent's children. He first spoke with respondent on March 13, 1988, the day before a court hearing regarding the children. Carpenter informed respondent that his children had been removed from their mother's custody and that he needed to appear in court to claim paternity. Respondent appeared in court, claimed paternity of the twins, and expressed his desire that his mother obtain custody of the children.
On April 8, 1988, Carpenter visited respondent at his mother's home, where he lived. He told respondent that he was entitled to weekly visitation and gave him his card and telephone number; he also informed respondent that he had a right to DCFS services if he wished to obtain custody of the children. Carpenter further informed respondent that the children could not be placed in his mother's custody while he lived there. Carpenter's conversation with respondent ended abruptly when respondent became angry and left the room after being told that his mother could not have custody.
On April 29, 1988, the first case review was held in the absence of both parents. Following the case review, Carpenter established a service plan containing one objective for respondentthat he "will again be offered services as needed including visitation rights." Carpenter recalled encountering respondent on the street sometime in the summer of 1988, at which time, he gave respondent the Agency's address and phone number and informed him that DCFS would facilitate visitation with his children. Respondent did not contact DCFS following this meeting. On cross-examination, Carpenter admitted that he had no record of this conversation.
In October 1988, the court held another case review. Carpenter testified that he knew respondent was incarcerated at that time, but he was unsure where. Because of this uncertainty, he sent a notification letter to his mother's address. On cross-examination, when shown his April 1989 review, Carpenter acknowledged that it stated that respondent had been in Cook County jail since September 1988.
Carpenter telephoned respondent's mother in March 1989 in an effort to locate respondent, but she did not know where he was incarcerated or what his inmate number was. Carpenter testified that he also phoned certain other relatives of respondent in an unsuccessful effort to locate him. Carpenter sent notice of the next case review, scheduled for April 1989, to respondent's mother's home.
Prior to the next case review, on March 22, 1989, Irma, respondent's third child, was born with traces of PCP and cocaine in her system. DCFS petitioned for adjudication of wardship and was granted custody of Irma on March 29, 1989. Respondent apparently claimed paternity of Irma in 1989. She was placed with a foster family in Rockford, Illinois, and later moved to Georgia with them.
A new client service plan was drafted on April 27, 1989[3] which set forth specific tasks and objectives which respondent would have to meet in order to gain custody of his children; these objectives were carried over to later plans. Under the plan, respondent was required to: cooperate with DCFS in planning for his children; supply DCFS with a complete social history; sign releases allowing DCFS to obtain information regarding his criminal, medical, and psychiatric history; and get substance abuse counseling. DCFS was obligated to monitor the case and to offer respondent visitation with his children. Although Carpenter learned in May 1989 that respondent was incarcerated at Stateville prison, he had no record of or recollection that a copy of the service plan was sent to that institution.
Carpenter again met respondent in court in May 1989 when Irma's case was considered. Carpenter recalled that respondent gave him his inmate number at Stateville but indicated that he would soon be transferred *1318 from that facility. Respondent expressed his desire that his sister obtain custody and he gave Carpenter her name and address. Respondent did not request visitation with the children.
Between May 1989 and October 1989, the next scheduled case review, DCFS attempted to contact respondent through his mother, but not at any correctional facility. Carpenter testified that notice of the October 1989 plan review and the service plan based upon that review were sent to respondent at Stateville, even though he had learned in May 1989 that respondent was scheduled to be transferred from that prison.
In December 1989, respondent was released from prison. Carpenter testified that he unsuccessfully attempted to contact respondent by phone at his mother's home in November 1989 and January 1990. However, he could not recall whether he spoke with anyone.
Between the April 1990 and October 1990 case reviews, Carpenter checked phone books and the public aid terminal in an effort to locate respondent. He also contacted respondent's parents. In October 1990, Carpenter learned from respondent's mother that he had again been incarcerated and that he was in Cook County jail. Carpenter sent a letter to respondent at the jail, but he did not remember the details of its contents.
By the next case review in October 1990, the case had been transferred to another DCFS worker, Sharon Evans. Because respondent's whereabouts were unknown, Evans sent certified letters to a number of his relatives and checked the phone book and public aid directory in an attempt to locate him. She then sent a letter to respondent's last known address, but she got no response. She also sent him the results of the October 31, 1990 case review. On cross-examination, Evans stated that she did not recall seeing any information regarding respondent's incarceration in the file she received from Carpenter.
On April 25, 1991, the date of another case review, Gregory Smith took over the case from Evans. He found that notice had been sent to "Lester Durdin" at respondent's mother's address on April 1, 1991, informing him of the case review. Respondent did not attend the case review and had not complied with the DCFS service plan. Smith engaged in a "diligent search," attempting to locate respondent through the phone book and public aid terminal. He sent certified letters to all persons with respondent's last name and received a return card signed by respondent on June 3, 1991. Respondent did not contact DCFS and, although another notification was sent to that address prior to the next case review in October 1991, respondent did not appear nor did he complete any tasks set forth in the plan. Smith sent another letter to the same address on June 14, 1991, indicating that it was urgent that respondent contact DCFS because the children's case was progressing towards adoption.
Smith conceded on cross-examination that he had not seen documents in respondent's file indicating that as of September 1989 he had been incarcerated in Stateville prison; he also conceded that he never visited respondent's mother's home in an attempt to locate respondent. After the October 1991 case review, but prior to the first adoption court date in January 1992, Smith learned that respondent was incarcerated. In April 1992, the twins' foster mother accompanied them to Stateville to visit respondent and subsequent visits occurred in court during the adoption proceedings.
Respondent testified that from the time of their births until 1992, he visited the twins only once when they were hospitalized as infants. He conceded that he had never visited Irma. However, he also testified that he requested visitation from Carpenter when he met with him at his mother's house, and although he never contacted Carpenter after that, he testified that he attempted to reach him.
Respondent's version of his meetings with Carpenter varied from Carpenter's testimony. In 1988, Carpenter informed respondent that DCFS was working towards reuniting the children with their mother. Respondent denied that Carpenter explained to him that he could gain custody and stated that he never saw a service plan. He recalled discussing visitation, not custody, with Carpenter *1319 and explained that he became angry and left the room when Carpenter would not tell him why DCFS could not bring his children to his mother's home for visits. He also recalled meeting Carpenter on the street a few weeks later, but he claimed that at that time, Carpenter merely reiterated what he had told him about visitation at his mother's house.
In 1990, respondent attempted to contact Carpenter with the assistance of a social worker at Cook County jail, but he was unavailable. No one from DCFS communicated with respondent at the jail and he made no further attempts to reach DCFS.
Respondent acknowledged that at an earlier proceeding he had admitted that he did not seek visitation with his children until April 1992, four years after the twins entered foster care. He also conceded that he never sought custody of his children or requested information from his attorney regarding his custody rights.
Respondent stated that he was incarcerated during the following periods: June 1987 through January or February 1988 in Cook County jail; January or February 1988 through December 1989 at Shawnee Correctional Center; June 1990 through 1991 in Cook County jail; and from sometime in 1991 throughout the trial court proceedings, at Hill Correctional Center. Respondent did not testify that he was ever in Stateville.[4] His incarceration resulted from convictions for possession of a controlled substance in 1988, for which he received a three year sentence, and armed robbery in April 1991, for which he received a nine year sentence.
Respondent's mother, Tcyphine Baldwin, testified, corroborating respondent's version of the meeting with Carpenter at her house in April 1988. She recalled receiving one certified letter from DCFS regarding a hearing, and one other letter indicating that the children were going to be placed for adoption. She also testified that no DCFS worker ever asked her where respondent was located.
At the close of the hearing, the judge found that the State had shown by clear and convincing evidence that respondent was an unfit person because of his failure to "maintain a reasonable degree of interest." After a best interests hearing, the judge held that it was in the children's best interests to have parental rights terminated, and he appointed a guardian with the right to consent to adoption. Respondent now appeals, contending that the judge's finding of unfitness was against the manifest weight of the evidence.
Respondent's primary contention is that DCFS prevented him from establishing contact with his children and that, as a result, the trial court erred in finding him unfit based on his failure to maintain a reasonable degree of interest, concern or responsibility towards them. (See In re Taylor (1975), 30 Ill.App.3d 906, 911, 334 N.E.2d 194, 197 (when official acts prevent parents from having contact with their children, lack of contact alone cannot be used to support a finding of unfitness).) Respondent also contends that despite his incarceration, he demonstrated "reasonable concern" for his children.
Termination of parental rights is an extraordinary measure given the superior right of parents, against all others, to raise their children. (See In re Woods (1977), 54 Ill.App.3d 729, 733, 12 Ill.Dec. 342, 346, 369 N.E.2d 1356, 1360; see also In re Adoption of Syck (1990), 138 Ill.2d 255, 274-75, 149 Ill.Dec. 710, 720, 562 N.E.2d 174, 184.) Accordingly, abrogation of this right may not occur in the absence of clear and convincing evidence of a parent's unfitness, which must be determined prior to consideration of the children's best interests. (See Syck, 138 Ill.2d at 273-74, 149 Ill.Dec. at 720, 562 N.E.2d at 184.) The Adoption Act defines an unfit person as one whom "the court shall find to be unfit to have a child, without regard to the likelihood that the child will be placed for adoption, the grounds of such unfitness being * * * (b) failure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare * * *." 750 ILCS 50/1(D)(b) (West 1993).
*1320 A reviewing court will not disturb the trial court's fitness finding unless it is against the manifest weight of the evidence, i.e., "the record clearly demonstrates that the result opposite to the one reached by the trial court was the proper result." (In re T.B. (1991), 215 Ill.App.3d 1059, 1062, 158 Ill.Dec. 780, 783, 574 N.E.2d 893, 896.) Reviewing courts accord the trial court's findings great deference in recognition of its unique ability to assess the credibility of witnesses. (T.B., 215 Ill.App.3d at 1062, 158 Ill.Dec. at 783, 574 N.E.2d at 896.) Each case concerning parental unfitness is sui generis (Syck, 138 Ill.2d at 279, 149 Ill.Dec. at 721, 562 N.E.2d at 185), requiring close analysis of its individual facts (Woods, 54 Ill. App.3d at 733-34, 12 Ill.Dec. at 346, 369 N.E.2d at 1360). Factual comparisons to other cases by reviewing courts are consequently of little value. In re S.J. (1992), 233 Ill.App.3d 88, 113, 174 Ill.Dec. 259, 275, 598 N.E.2d 456, 472.
Our supreme court has instructed that when reviewing a finding of unfitness based upon a parent's failure to maintain interest, concern or responsibility for the children, a court must examine the parent's conduct in the context of the parent's circumstances. (Syck, 138 Ill.2d at 278, 149 Ill.Dec. at 721, 562 N.E.2d at 185.) Relevant circumstances include, for example, difficulty in obtaining transportation, the parent's poverty, statements made by others to discourage visitation, and whether the parent's lack of contact with the children can be attributed to a need to cope with personal problems rather than indifference towards them. (Syck, 138 Ill.2d at 279, 149 Ill.Dec. at 721, 562 N.E.2d at 185.) If visitation is impossible, letters, cards, gifts, and telephone calls may suffice to show a parent's concern and interest in the children. (Syck, 138 Ill.2d at 279, 149 Ill.Dec. at 721, 562 N.E.2d at 185.) In a fitness determination, a parent's efforts, not the success of those efforts, are relevant. Syck, 138 Ill.2d at 279, 149 Ill.Dec. at 721, 562 N.E.2d at 185; see also S.J., 233 Ill. App.3d at 115, 174 Ill.Dec. at 275-76, 598 N.E.2d at 472-73; Woods, 54 Ill.App.3d at 735, 12 Ill.Dec. at 346-47, 369 N.E.2d at 1360-61.
We recognize the significant role DCFS plays in cases such as the one at bar. When a child is abused or neglected, DCFS "shall assess the family's need for services, and, as necessary, develop, with the family, an appropriate service plan * * *." The service plan may include counseling, parent education and homemaker services. (325 ILCS 5/8.2 (West 1993).) DCFS must "promptly notify" the family of the availability of the services contained in the service plan. (325 ILCS 5/8.2 (West 1993); see also 20 ILCS 505/5(l) (West 1993) At a fitness hearing, a parent's noncompliance with the service plan may be evidence of unfitness. See In re J.F. (1993), 248 Ill.App.3d 1, 187 Ill.Dec. 698, 618 N.E.2d 289; S.J., 233 Ill.App.3d 88, 174 Ill. Dec. 259, 598 N.E.2d 456.
In the case at bar, Smith testified that he had evaluated respondent's progress under the service plans as "unsatisfactory" despite the fact that DCFS failed to inform respondent of the various service plans which were created to enable him to work towards visitation and/or custody of his children. There is no indication in the record that any of the DCFS workers involved in this case ever contacted the Department of Corrections in an effort to locate respondent, a step which appears elementary when attempting to locate a prisoner. Carpenter apparently did not check his own records, which indicated that respondent was in Cook County jail, when he sent a case review notification to respondent's mother in October 1988. He did not send a copy of the April 1989 service plan to respondent, even though he believed that he was incarcerated at Stateville; and, when he sent a copy of the October 1989 service plan to Stateville, he was aware that respondent had been scheduled to leave that institution. Finally, in 1990, Carpenter learned respondent's whereabouts and wrote to him at Cook County jail. Since Carpenter failed to record several attempts to contact respondent, he was forced to testify largely from memory regarding events which had occurred four to five years earlier, among what surely were hundreds of others, considering the case load he must have been managing, prompting the State's concession that his testimony was "comical." While Evans *1321 and Smith made various attempts to find respondent, neither learned from his file that he had been incarcerated.
Overall, we find DCFS' handling of this case inexcusably clumsy given the magnitude of its responsibility to aid neglected children and their parents and its commensurate power to influence whether a parent will continue to enjoy the intimate and fundamental right to raise his or her children. Thus, we agree with respondent that since DCFS did not keep him apprised of the service plans, his failure to complete the tasks within those plans cannot alone support the finding of unfitness.
We turn now to our evaluation of whether clear and convincing evidence supports the conclusion that respondent has not shown adequate interest and concern for his children, disregarding his noncompliance with DCFS' service plans. This analysis obviously is not amenable to an exact quantitative or qualitative study. (See In re Hoback (1981), 95 Ill.App.3d 169, 171, 50 Ill.Dec. 605, 606, 419 N.E.2d 713, 714.) Nevertheless, viewing the record in the context of respondent's circumstances, we find that his efforts to contact his children were not even minimal. Between 1988 and 1992, he made no attempt to contact the Agency to arrange visits with the twins or to inquire as to their welfare. The record is devoid of any evidence that respondent sent cards, letters or gifts to his children, or in any way manifested his concern for them. Aside from one unsuccessful attempt to contact DCFS from Cook County jail in 1990, respondent admitted that he did not call that agency to check on his children. In 1992, he visited with the twins in prison, but he never visited Irma.
To respondent's credit, he claimed paternity of the children and expressed his desire that they be placed with his mother, and later, with his sister. However, after Carpenter visited him at his mother's home, respondent made no further effort to arrange visitation and he never expressed an interest in obtaining custody of the children. Moreover, respondent never informed DCFS of his whereabouts while in prison, nor did he take the opportunity to contact DCFS during the six-month period that he was not incarcerated. Respondent's conduct, in our view, demonstrated an inexplicable and utter disregard for the welfare of his children.
In his brief and at oral argument, respondent indicated that the trial court erroneously based its unfitness finding on respondent's failure to comply with DCFS' service plans. However, the judge did not elaborate on his reasons for finding respondent unfit. Even though we believe that respondent should be excused from complying with the service plans due to DCFS' botched handling of this case, we find ample support in the record for the judge's ruling. Respondent's complete failure to reach out to his children or to inform DCFS of his interest in their wellbeing, belies his contention that he demonstrated reasonable concern for them under the circumstances. (See In re Jason U. (1991), 214 Ill.App.3d 545, 553, 158 Ill.Dec. 296, 301, 574 N.E.2d 90, 95 (even if DCFS caseworker did not inform father that noncompliance with service plan could result in termination of his parental rights, father was not excused from failing to contact his children for two-and-one-half years after they had been placed in DCFS' custody).) We are aware that respondent's long periods of incarceration severely restricted his ability to demonstrate concern for his children (see In re Jones (1975), 34 Ill.App.3d 603, 610, 340 N.E.2d 269, 274-75), but he was not prevented from making some efforts towards that end.
The cases respondent relies on are inapposite because in those cases, the parents tried, in the face of obstacles, to show interest, concern and responsibility for their children. For example, in In re Overton (1974), 21 Ill.App.3d 1014, 316 N.E.2d 201, DCFS took custody of the respondent's children after she was injured in a car accident and could not care for them. A DCFS caseworker failed to encourage her to visit her children, no one at DCFS responded to her letter which informed that agency that she was leaving Illinois and expressed concern for her children, and when she sent a gift to the children at DCFS, DCFS failed to deliver it. In reversing the trial court's finding of unfitness, we observed that the respondent's attempts to show her concern for her children were thwarted by DCFS. Overton, 21 Ill. App.3d at 1019-20, 316 N.E.2d at 205.
*1322 Likewise, in In re Deerwester (1971), 131 Ill.App.2d 952, 267 N.E.2d 505, we found that the evidence failed to support the trial court's finding of unfitness. There, the appellant attempted to maintain contact with her disabled son, whom DCFS had placed in foster care. She sent him birthday, Valentine's Day, and Christmas cards, frequently called caseworkers, and personally visited DCFS five times in four years. She also attempted to visit her son, but, because of transportation problems, she managed only one visit in two years. Deerwester, 131 Ill.App.2d at 952-55, 267 N.E.2d at 506-07.
We find no similar manifestation of concern by respondent for his children. Compare Jones, 34 Ill.App.3d at 610-11, 340 N.E.2d at 274-75 (when State agency failed to inform incarcerated father that his children had been placed in a foster home, his lack of contact with them was understandable, and in view of the letters and Christmas gifts he sent the children, clear and convincing evidence of unfitness was not shown). Accordingly, based upon the foregoing, we hold that the trial court's findings were not against the manifest weight of the evidence. We therefore affirm the trial court's ruling.
Affirmed.
HARTMAN and McCORMICK, JJ., concur.
NOTES
[1] Respondent is not the father of the older children and they are not involved in this case.
[2] Irma Durdin, the children's mother, did not appear at the fitness hearing and is not appealing the termination of her parental rights.
[3] The record contains a copy of only the April 29, 1988 service plan, although other plans were admitted into evidence. Those plans were dated: October 12, 1988; April 27, 1989; October 28, 1989; April 24, 1990; and October 31, 1990.
[4] Although respondent made no reference to his being incarcerated at Stateville, the twins' foster mother testified at the best interests hearing that she took the twins to Stateville to visit him.