673 N.E.2d 439 (1996)
284 Ill. App.3d 686
220 Ill.Dec. 527
In re V.O., D.P., J.P., T.P., J.P., P.P., J.P., J.P., & M.P., Minors
The People of the State of Illinois, Petitioner-Appellee,
v.
Jonathan P., Respondent-Appellant.
No. 3-96-0117.
Appellate Court of Illinois, Third District.
November 14, 1996.
*440 Philip M. Pollock, Peoria, for Jonathan Pickett.
John X. Breslin, Deputy Director, State's Attorneys Appellate Prosecutor, Ottawa, Kevin W. Lyons, State's Attorney, Peoria, and J. Paul Hoffmann, State's Attorneys Appellate Prosecutor, Ottawa, for the People.
Susan K. Lucas, Peoria, Guardian Ad Litem.
Justice LYTTON delivered the opinion of the court:
The respondent, Jonathan P., appeals from the judgment of the circuit court which found him to be an unfit parent and terminated his parental rights. We affirm.

BACKGROUND
On February 25, 1993, seven of the respondent's nine children were adjudicated neglected. The counts of neglect were based upon their mother's drug addiction and the injurious nature of their environment stemming from that addiction. 705 ILCS 405/2-3(1)(b) (West 1992). The remaining two children were subsequently adjudicated neglected after they were born with cocaine in their systems. 705 ILCS 405/2-3(c) (West 1992). The children ranged in age from 12 years to 6 months.
The unfitness hearing was held on November 8, 1995. Elizabeth Clayton, a Department of Children and Family Services (DCFS) caseworker, testified that she had been involved in this case since March 1, 1993. At that time, the respondent's service plan objectives were to obtain employment, attend parenting classes, and receive drug, alcohol and psychological evaluations. When that service plan was later evaluated, the only goal the respondent had completed was the psychological evaluation. In November 1993, the respondent began unsupervised visits *441 with his children. However, in April 1994, those visits were terminated because he repeatedly allowed the children to see their mother in violation of a court order.
His next service plan, devised in April 1994, required him to participate in a 12-step program to learn about substance abuse and the effects of such abuse on his family. However, he had not attended the program at the time of his next evaluation. Clayton further testified that the respondent made poor progress with the November 1994 service plan. He eventually went to a drug and alcohol evaluation in January 1995. The evaluators told him that they thought he had an alcohol problem and that he should participate in a weekly class. He refused to participate, however, because he did not believe that he had a problem.
According to Clayton, during the time she was the respondent's caseworker, he failed to attend 25% of the scheduled visits. She also said that from about October 1993 to January 1995, the respondent had the same address as the children's mother, Bunny P. The court had prohibited Bunny from seeing the children due to her drug addiction. To the best of Clayton's knowledge, the respondent and Bunny lived together during the time they shared an address. At other times, Clayton did not have an address for the respondent.
Kelly Anderson, a caseworker for Counseling and Family Services, testified that she evaluated the respondent's compliance with the May 1995 service plan. At that time, he still had not completed a 12-step program which DCFS had requested in 1994. Anderson also observed the respondent's visits with the children beginning in June 1995. The respondent would sit in a chair and occasionally ask one of the children to sit in his lap. He would direct the children from the chair to stop fighting and hitting each other. At one point, however, the respondent said, "go ahead and tear up the room, because we have to be in such a small place anyway."
The State then called the respondent as an adverse witness. He testified that he lived alone at the Shamrock Hotel and had lived there for about three months. However, he admitted that his wife had spent the night with him there about a month before. He said that he and his wife last lived together on a full-time basis in September 1994, when he was found in contempt for allowing her to have contact with the children. He said that they have continued to see each other and she sometimes spent the night with him. Finally, the respondent denied allowing any contact between the children and their mother other than yelling out the window, which he did not consider "contact" with the children. He denied having previously told the court at a review hearing that he had allowed contact between the children and his wife.
Clayton was recalled as a rebuttal witness. She testified that in a court review on January 28, 1994, the trial judge asked the respondent if he was allowing contact between his wife and the children. The respondent said that he was allowing her to see them and that she was their mother and would not harm them.
The respondent then testified on his own behalf. He admitted that he did not complete the 12-step program. He said he did not do so because its purpose was to understand the effects of drug abuse on the family and, since he no longer lived with his wife, he did not need to attend the sessions. He said he had not lived with his wife for 1½ to 2 years and did not intend to live with her again. He said he understood that her parental rights have been terminated and that she is allowed no contact with the children.
At the conclusion of the evidence, the trial court found the respondent unfit because he (1) failed to make reasonable efforts to correct the conditions which were the basis for the removal, and (2) failed to make reasonable progress toward the return of the children within 12 months of adjudication. 750 ILCS 50/1(D)(m) (West 1992).
At the best interests hearing, Anderson and Clayton submitted reports about the children to the court. Emily McGhee of Counseling and Family Services and Pat Alexander of DCFS also submitted reports. In general, their reports concluded that the respondent had failed to take any responsibility for his children being in foster care. He *442 continued to believe that he and his wife were good parents who had done nothing wrong, and he continued to support his wife rather than work toward the return of the children. According to the reports, the respondent told the children during visits that the only reason they were not at home was because he needed to find a large enough place for them all to live. This explanation left the older children hopeful, confused, and frustrated. The reports also stated that the respondent's sporadic attendance at visits belied his claims of interest. On October 6, 1993, the caseworkers began requiring him to call the day before a visit to confirm that he would attend because he had missed five visits in a six-month period without explanation. Since March 1994, the respondent did not attend 14 of the 35 scheduled visits. Finally, the authors concluded that it would be in the best interests of the children to terminate the respondent's parental rights.
The respondent testified that he had moved from the Shamrock Hotel to his sister's house and was saving money to obtain living arrangements suitable for himself and the children. He said that although he would like all of the children returned to him, he would particularly like a chance with the three oldest ones. He testified that it was not his fault that his children were taken away. He also noted that he had completed a 12-step Al-Anon program and had begun working at the Peoria Civic Center.
Thelma Munoz, the respondent's mother and the foster mother of two of the children, testified that the girls always talked about their father and hoped that some day he would come home. She said that prior to the children going into foster care, the respondent took care of them more than his wife did.
Tina Hopson, the respondent's sister, testified that when she was younger and "running the streets" her brother lived with her and took care of her child. She said that when her brother has his children he takes good care of them and neighbors call him Mr. Mom.
After hearing all the evidence, the court terminated the respondent's parental rights.

DISCUSSION
On appeal, the respondent first argues that the trial court's finding that he was unfit was against the manifest weight of the evidence.
In this case, the State alleged that the respondent failed to make reasonable efforts to correct the conditions that were the basis for removal of the children and failed to make reasonable progress toward the return of the children. 750 ILCS 50/1(D)(m) (West 1992). Whether a parent's efforts to correct conditions are reasonable involves a subjective judgment of a particular parent's efforts; however, the reasonableness of a parent's progress toward the child's return is measured objectively by the amount of movement toward the goal of reunification. In re L.L.S., 218 Ill.App.3d 444, 160 Ill.Dec. 804, 577 N.E.2d 1375 (1991). A finding of unfitness must be based on evidence that is clear and convincing. In re Adoption of Syck, 138 Ill.2d 255, 149 Ill.Dec. 710, 562 N.E.2d 174 (1990). Once such a finding has been made, however, it will be given great deference and will not be disturbed on appeal unless it is contrary to the manifest weight of the evidence. In re J.B., 198 Ill.App.3d 495, 144 Ill.Dec. 679, 555 N.E.2d 1198 (1990).
Here, we find that there was ample evidence of unfitness. The respondent's children were removed from his home due to his wife's drug abuse problem. However, he allowed the children to see their mother even after being ordered by the trial court not to do so. He repeatedly failed to complete a 12-step program to understand how drug abuse affected his family until after the unfitness hearing. He lived with his wife for much of the time that he was supposed to be working toward the return of his children. He failed to attend many of the visits that DCFS arranged for him to see his children. In sum, we find that the respondent consistently demonstrated both a lack of reasonable effort and reasonable progress. Accordingly, we hold that the trial court's decision finding him unfit is not against the manifest weight of the evidence.
Next, the respondent argues that the State did not prove by clear and convincing evidence *443 that it was in the children's best interests to terminate his parental rights.
In response, the State argues that the proper burden of proof of the children's best interest lies within the sound discretion of the trial court, and its decision will not be reversed absent an abuse of that discretion. See In re Jason U., 214 Ill.App.3d 545, 158 Ill.Dec. 296, 574 N.E.2d 90 (1991). Within this argument, the State submits that our decision in In re B.C., 247 Ill.App.3d 803, 187 Ill.Dec. 486, 617 N.E.2d 1207 (1993), is incorrect. In B.C., we indicated that clear and convincing evidence was necessary to terminate parental rights. B.C., 247 Ill.App.3d at 806, 187 Ill.Dec. at 489, 617 N.E.2d at 1210. We have reexamined this issue, however, and agree with the State that once a parent has been found unfit by clear and convincing evidence, the decision to terminate an individual's parental rights rests within the sound discretion of the trial judge.
The remaining question is whether the trial court abused its discretion in terminating the respondent's parental rights. In this case, the respondent failed to take responsibility for his children being in foster care. As late as the best interest hearing, he did not believe that it was his fault that his children were taken from him. He misled the children about an eventual homecoming, which only confused and frustrated them. He could not even manage to show enough interest or concern to attend the planned visits with the children, missing almost half of the visits from March 1994 to the time of the hearings. The trial court did not abuse its discretion in terminating the respondent's parental rights.
The judgment of the circuit court of Peoria County is affirmed.
Affirmed.
MICHELA and SLATER, JJ., concur.